713 A.2d 1033

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SHAWN SMITH, DEFENDANT–APPELLANT.

Argued January 5, 1998—Decided July 16, 1998.

86

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for defendant-appellant (*Ivelisse Torres,* Public Defender, attorney).

*Frank Muroski,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Thomas V. Manahan,* Union County Prosecutor, attorney).

*Leslie Stolbof Sinemus,* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers–New Jersey.

*Gerard C. Sims, Jr.,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney).

HANDLER, J.

This is a search and seizure case. In this case, and in *State v. Zutic*, 155 *N.J.* 103, 713 *A.*2d 1043 (1998), also decided today, the central issue is whether incriminating evidence that was used to secure a defendant's conviction for drug offenses was obtained as the result of an unreasonable warrantless search of the defendant's person. The more specific issue is whether a confidential informant's tip, together with some corroboration of the information contained in the tip, established probable cause to justify the search of defendant's person. An additional issue relates to whether the ultimate seizure of the incriminating drugs was tainted by the initial personal search of defendant without probable cause.

I

On February 23, 1993, a confidential informant told Detective Robert Hilongos, an experienced member of the Narcotics Bureau of the Elizabeth Police Department, that a man was selling drugs in the lobby of the Oakwood Plaza Apartments, located at 400 Ivington Avenue in Elizabeth. The informant described the man as a black man wearing a three-quarter length jacket and a yellow cap. The informant said the man was taking orders from people in the lobby and then retrieving drugs from apartment # 2L. The informant also said that the man was using a red Datsun parked across the street with license plate number HIO 33D.

Hilongos knew the informant and believed him to be reliable. The informant had done "one job" for Hilongos in the past, and the informant's information resulted in an arrest and conviction. A few minutes after receiving the tip, Hilongos and two other police officers proceeded to Oakwood Plaza in an unmarked vehicle. Two uniformed officers were also called to the scene. Upon arrival, Hilongos saw a black man wearing a three-quarter length black coat and a yellow cap and standing on the sidewalk approximately fifty or sixty feet from the lobby entrance. There was a red Datsun parked across the street from the apartments, but

Hilongos could not remember if he saw the car before or after stopping defendant.

Hilongos stopped and searched the man who was later identified as defendant, Shawn Smith. He seized a pair of keys from defendant. Hilongos testified that he was searching for drugs and that he knew the keys were not a weapon. None of the keys were imprinted with an apartment number or any other distinguishing marks. When asked what he was doing in the area, defendant told Hilongos that he lived in Newark but was visiting relatives in the area. Hilongos testified that he did not attempt to conduct surveillance or otherwise verify the informant's tip because it was impracticable.

After seizing the keys, Hilongos had the two uniformed officers detain defendant while he went upstairs and knocked on apartment # 2L. He also called the apartment manager, Kathy Ryan, to the scene. While waiting for Ryan, Hilongos knocked on the door to # 2L, but no one answered. A neighbor, Andrea Smith, informed Hilongos that someone named Stacy Walker lived in the apartment but Walker was in the hospital. According to Hilongos's testimony, Andrea Smith told him that Walker was her sister and defendant was her brother. Andrea Smith testified, however, that defendant is not related to her.

Either Andrea Smith or another neighbor, Patricia Wright, called Walker at the hospital. The phone was passed from Smith to Ryan and then to Hilongos. Eventually, Walker gave Hilongos permission to enter the apartment. Ryan testified that she "told [Walker] that the cops wanted to get into her unit because apparently they had somebody that had keys or something to her unit." Hilongos testified that he could not remember if he told Walker that she had a right to refuse permission to enter the apartment. Walker testified that Ryan told her that police needed access to Walker's apartment and they wanted permission to enter the apartment. Ryan advised Walker that she had a right to refuse access to her apartment, but warned Walker that her refusal would cause the police to obtain a search warrant and "if

the police had to get a warrant to get in, [Walker] would be responsible for damages because normally they break the door." Walker testified that the police told her that they needed to enter her apartment to retrieve defendant's wallet.

Ryan and Andrea Smith described Walker, who was pregnant and was hospitalized because of high blood pressure, as being "upset," "crying," and "hysterical" during their telephone conversations with her. Andrea Smith testified that "[Ryan] was trying to calm her down and I heard her telling Stacy something to the effect, no, you're not going to lose your apartment and you have nothing to worry about and you don't have to let them go into the house." Walker gave Hilongos permission to enter her apartment after Ryan assured her that she would not be evicted.

After Walker consented to the entry, Hilongos entered apartment # 2L by using one of the keys he had seized from defendant. The police found inside the refrigerator a plastic bag containing fifty-nine vials of what looked like cocaine. Hilongos then "notified the officers that were holding [defendant] to place him under arrest."

On July 1, 1993, a Union County Grand Jury indicted defendant, charging him with third degree possession of a controlled dangerous substance (CDS) (count one), third degree possession of a CDS with intent to distribute (count two), and third degree possession of a CDS with intent to distribute within 1000 feet of a school (count three).

The trial court denied defendant's motion to suppress the keys and the cocaine. The court held that whereas the seizure of the keys was unlawful, the discovery of the cocaine was lawfully based on Walker's consent. The court held that once the cocaine was discovered, the keys would have inevitably been discovered. Therefore, the court denied the suppression motion in respect of both the keys and the cocaine. After losing the suppression motion, defendant pled guilty.

Defendant appealed the denial of his motion to suppress, and the Appellate Division affirmed. 291 *N.J.Super.* 245, 677 *A.*2d 250 (1996). The Appellate Division ruled that the search of defendant was justified by probable cause to arrest him. *Id.* at 258, 677 *A.*2d 250. The court sustained the search of the apartment based on Walker's consent. *Ibid.* In the alternative, the court held that defendant had no expectation of privacy in the apartment to support a claim that the search violated his constitutional rights. *Id.* at 261, 677 *A.*2d 250. We granted certification on March 4, 1997. 149 *N.J.* 33, 692 *A.*2d 47.

## II

█ Our analysis of Smith's suppression motion begins with a consideration of whether the on-the-street search which yielded the keys was constitutional. Probable cause is ordinarily needed in order to justify a search. *See State v. Novembrino,* 105 *N.J.* 95, 106, 519 *A.*2d 820 (1987) ("The probable-cause requirement is the constitutionally-prescribed standard for distinguishing unreasonable searches from those that can be tolerated in a free society."). The State's constitutional standard parallels that of the United States Constitution. *Chambers v. Maroney,* 399 *U.S.* 42, 51, 90 *S.Ct.* 1975, 1981, 26 *L. Ed.*2d 419, 428 (1970) ("In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution.").

█ In limited circumstances, police may conduct a protective search of a suspect without probable cause. *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L. Ed.*2d 889 (1968). A protective search does not entail a general search of the person for evidence of crime; rather it is "designed to discover weapons that could be used to assault the officer." *State v. Arthur,* 149 *N.J.* 1, 14, 691 *A.*2d 808 (1997). A protective search may be based on reasonable articulable suspicion that a suspect is armed and dangerous. *Ibid.* Hilongos's search of defendant was for contraband and not for

weapons; thus, the protective search exception to probable cause does not apply, and probable cause was required to justify the search of defendant.

■ The Appellate Division held that Hilongos had probable cause that served as a basis for Smith's arrest and, therefore, the ensuing personal search of Smith was undertaken as an incident to that arrest. 291 *N.J.Super.* at 258, 677 *A.*2d 250. However, the police must have contemporaneous subjective intent to arrest in order to justify a search incident to arrest. *State v. Sims,* 75 *N.J.* 337, 353, 382 *A.*2d 638 (1978). There is no evidence that Hilongos had a subjective intent to arrest Smith when he stopped and subjected him to a search. Nonetheless, because probable cause to arrest is the functional equivalent of probable cause to search, the test for determining probable cause must still be met. The basic issue, therefore, was whether there was probable cause to justify the personal search of defendant.

■ Hilongos's suspicions were primarily based on a tip from a confidential informant. Information related by informants may constitute a basis for probable cause. Such information, though hearsay, may provide a sufficient basis for probable cause, "so long as a substantial basis for crediting the hearsay is presented." *Novembrino, supra,* 105 *N.J.* at 111, 519 *A.*2d 820 (quoting *Jones v. United States,* 362 *U.S.* 257, 269, 80 *S.Ct.* 725, 735, 4 *L.Ed.*2d 697, 707 (1960)). The sufficiency of the information related by an informant as a basis for establishing probable cause is determined by a standard that calls for consideration and analysis of all relevant circumstances.

In *Illinois v. Gates,* 462 *U.S.* 213, 103 *S.Ct.* 2317, 76 *L. Ed.*2d 527 (1983), the United States Supreme Court held that the reliability of an informant's tip must be analyzed under the totality of the circumstances. *Id.* at 238, 103 *S.Ct.* at 2332, 76 *L. Ed.*2d at 548. We adopted that test under our Constitution in *Novembrino, supra,* 105 *N.J.* at 122, 519 *A.*2d 820. *See State v. Lewis,* 116 *N.J.* 477, 486, 561 *A.*2d 1153 (1989) (observing in a case involving a

warrantless search "[w]e follow the totality of the circumstances test for probable cause.").

Two factors generally considered to be highly relevant, if not essential, that are included in the "totality of the circumstances" are the informant's "veracity" and the informant's "basis of knowledge." *Gates, supra,* 462 *U.S.* at 238, 103 *S.Ct.* at 2332, 76 *L. Ed.*2d at 548. Those factors, which are considered in evaluating the totality of circumstance, were derived from earlier cases that invoked and applied them as necessary prongs in determining probable cause, *Aguilar v. Texas,* 378 *U.S.* 108, 84 *S.Ct.* 1509, 12 *L. Ed.*2d 723 (1964), and *Spinelli v. United States,* 393 *U.S.* 410, 89 *S.Ct.* 584, 21 *L. Ed.*2d 637 (1969)). Unlike the two-prong test that had been formulated in *Aguilar* and *Spinelli,* under which both "veracity" and "basis of knowledge" were essential elements in demonstrating probable cause, neither of these factors, though relevant, is an essential element under the totality of the circumstances test. Under *Gates,* a deficiency in one of the *Aguilar /Spinelli* factors "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates, supra,* 462 *U.S.* at 233, 103 *S.Ct.* at 2329, 76 *L. Ed.*2d at 545. *Gates* recognized, in the parallel context of probable cause sufficient to obtain a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 *S.Ct.* at 2332, 76 *L. Ed.*2d at 548.

Because each of the *Aguilar/Spinelli* factors constitutes a relevant circumstance, both must be considered in assessing all of the surrounding circumstances. The first factor focuses on the informant's "veracity." In looking to whether an informant demonstrates "veracity," this Court has previously stated that past instances of reliability may establish the informant's veracity.

*State v. Ebron,* 61 *N.J.* 207, 212–13, 294 *A.*2d 1 (1972) (holding under *Aguilar/Spinelli* that satisfactory prior experience with an informant was sufficient to meet the requirement of veracity). Under the totality of the circumstances test, past reliability remains probative of veracity, although its weight in the ultimate determination of probable cause may vary with the circumstances of each case. For example, in *Novembrino, supra,* we recognized that an informant's veracity could be supported by information that the informant has "proven reliable in several investigations (with information he provided)." 105 *N.J.* at 123, 519 *A.*2d 820. Nonetheless, a few past instances of reliability do not conclusively establish an informant's reliability.

■ The second factor under *Gates,* is whether the informant had a "basis of knowledge" for the information given to the police. The basis of knowledge is relevant to a determination that the information was obtained in a reliable way. *Novembrino, supra,* 105 *N.J.* at 113, 519 *A.*2d 820. The "basis of knowledge" can be disclosed by the informant if the tip itself relates expressly or clearly how the informant knows of the criminal activity. *Ibid.* Even in the absence of a disclosure that expressly indicates the source of the informant's knowledge, the nature and details revealed in the tip may imply that the informant's knowledge of the alleged criminal activity is derived from a trustworthy source. *Ibid.* Such detailed or special information is particularly important if the tip does not otherwise disclose that the informant's knowledge is based on trustworthy sources. Thus, in *Novembrino,* we stated: "In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Ibid.* (citing *Spinelli, supra,* 393 *U.S.* at 416, 89 *S.Ct.* at 589, 21 *L. Ed.*2d at 644); *see State v. Perry,* 59 *N.J.* 383, 392–93, 283 *A.*2d 330 (1971) (holding that an informant's tip

detailing that 'Monies, jewelry, doctor's bag and narcotics' were in the a particular location contained the type of detail that was probably known from personal knowledge). By providing sufficient detail in the tip or recounting information that could not otherwise be attributed to circulating rumors or be easily gleaned by a casual observer, an informant can implicitly disclose a reliable basis of knowledge as the foundation of the information related to the police.

The basis of knowledge for the tip can also be established by predicting hard-to-know *future* events. The prediction of future events can imply that the informant derived that information directly as a witness or as one privy to a reliable witness or source. The prototypical case in which prediction of future events provided the basis of knowledge for the tip is *Draper v. United States*, 358 *U.S.* 307, 79 *S.Ct.* 329, 3 *L. Ed.*2d 327 (1959). In *Draper*, the informant indicated that the defendant would be arriving by train from Chicago at a particular time of day and provided a description of the defendant's physical appearance, the clothing he would be wearing, the bag he would be carrying, and the brisk pace of his gait. *Id.* at 309, 79 *S.Ct.* at 331, 3 *L. Ed.*2d at 329–30. It is unlikely that an informant could provide such detail about future events unless the informant had a sufficient basis of knowledge of the underlying criminal conduct. Therefore, the mere allegation that such future events will occur is sufficient to infer that the informant is at least claiming to be relying on a reliable source.

Because the information contained in an informant's tip is hearsay and must be invested with trustworthiness to be considered as probative evidence, corroboration is an essential part of the determination of probable cause. Independent corroboration is necessary to ratify the informant's veracity and validate the truthfulness of the tip. "[T]he informant's veracity, if inadequately documented in the officer's affidavit, could be bolstered by a corroborative investigation." *Novembrino, supra,* 105 *N.J.* at 113, 519 *A.*2d 820. As Justice White observed in *Gates,* if police

corroborate "information from which it can be inferred that the informant's tip was grounded on inside information, this corroboration is sufficient to satisfy the basis of knowledge prong" as well as the veracity prong. *Gates, supra,* 462 *U.S.* at 270 n. 22, 103 *S.Ct.* at 2349–50 n. 22, 76 *L. Ed.*2d at 569 n. 22 (White, J., concurring); *Novembrino, supra,* 105 *N.J.* at 114 n. 6, 519 *A.*2d 820.

Two cases that demonstrate the importance of corroboration are *Draper, supra,* and *State v. Hutchins,* 116 *N.J.* 457, 561 *A.*2d 1142 (1989). In *Draper,* police corroboration of hard-to-know predictive detail generated a strong inference that the informant was not fabricating the story and that the allegation that the defendant would be carrying drugs was also based on reliable information. 358 *U.S.* at 313, 79 *S.Ct.* at 333, 3 *L. Ed.*2d at 332. In *Hutchins, supra,* the police received a tip that "a black man named Bob, dressed in blue, was selling heroin from a certain address in Newark." *Id.* at 459, 561 *A.*2d 1142. We remanded the case for the trial court to resolve certain factual issues including whether the police corroboration sufficiently bolstered the unverified tip. *Id.* at 460, 474, 561 *A.*2d 1142. Thus, under a totality of the circumstances test, corroboration of information provided in a tip can be a strong indicia of the reliability of the informant's tip.

In applying this analysis to the facts of this case, we may conclude that there was some evidence of the informant's veracity. Hilongos stated he believed the informant to be reliable because "[h]e did a job for me in the past." Under *Aguilar/Spinelli,* a single instance of past reliability would have been sufficient evidence of the veracity factor. *See Ebron, supra,* 61 *N.J.* at 212–13, 294 *A.*2d 1. However, under the totality of the circumstances test, we must determine how much weight to give the informant's veracity in reaching the ultimate determination of probable cause. As to its weight, the recitation in the tip reveals little about Hilongos's informant other than that the informant had been reliable once previously in a case that led to a conviction. *Cf. Zutic, supra,* 155 *N.J.* at 111, 713 *A.*2d 1047 (indicating that

conclusory statement that informant was reliable insufficient to establish veracity). While that information increases the likelihood that the informant was being truthful and possessed the necessary "veracity," without more information relating to the informant's history or motives, the information does not firmly establish his truthfulness in this case.

The "basis of knowledge" factor must also be assessed under the totality of circumstances in accordance with its weight. Although the informant did state that the transactions were going on "at that time," the informant did not expressly allege or otherwise indicate the source or basis of his or her knowledge in relating the tip. As noted, the contents of a tip, particularly the kind of factual details provided, can inferentially establish the informant's claim of a reliable basis of knowledge. The tip here alleged that defendant was meeting people in the lobby, going into apartment # 2L, and returning to the lobby to give the people drugs. It also mentioned that a particular car used by defendant was located on the street in the area. The Appellate Division found that "in all likelihood only one conversant with the criminal activity would know" those details. 257 *N.J.Super.* at 257, 608 *A.2d* 404. Although the informant provided a detailed description of the suspect's movements about the building, the informant did not provide any detail about the drug transactions themselves. If the informant had been privy to the criminal activity, he or she would have been likely to know such detail as the manner the drugs were packaged or where the drugs were kept in the apartment. This informant provided no such information. The detail about the suspect's movements was not information the informant could claim to know only if he or she had a reliable source of information. The lack of detail and other special or unusual facts militates against the inference that the informant had a sufficient basis of knowledge that defendant was engaging in unlawful drug transactions. Rather, the descriptive information is such that it can be readily inferred that the informant was not an insider or a person especially close to defendant or directly aware of the criminal activities ascribed to defendant. No detail included in the

tip provides information from which it may be inferred that the informant had personal knowledge or was privy to a reliable person with such knowledge that defendant was entering the apartment to obtain drugs and returning with drugs, nor does any detail of the tip indicate or reveal how the informant knew that defendant's conduct involved a drug transaction. Without knowing the facts that led the informant to believe defendant was engaged in illegal activity, we cannot make an independent determination of whether that conclusion was reasonable. *See Novembrino, supra,* 105 *N.J.* at 125, 519 *A.*2d 820 (holding that an informant's bald conclusion "unsupported by a reference to dates, events, or circumstances" did not give a neutral judge a basis for making an independent evaluation).

The evidentiary weakness of the basis-of-knowledge factor under the totality of the circumstances test goes only to the weight and does not as such necessarily establish the absence of probable cause. Even where the tip lacks sufficient detail to establish a basis of knowledge, independent police investigation and corroboration of the detail in the tip must be considered because it may in some circumstances add to the evidentiary weight of factors as well as the overall circumstances. In reaching the conclusion that the police had probable cause, the Appellate Division observed that the police corroborated the informant's description of the suspect, the modus operandi, and the use of the red Datsun. 291 *N.J.Super.* at 257–58, 677 *A.*2d 250. The police corroborated defendant's description and approximate location, but the evidence does not support the finding that they corroborated the modus operandi or the use of the Datsun. When making its factual findings, the trial court acknowledged, "The State concedes that other than seeing a man dressed as indicated in the tip, the police did nothing to corroborate any other information because it was 'not feasible.'" That finding is supported by the record. To the extent that the tip described a modus operandi, it alleged that the suspect would be meeting with people and going back and forth between the lobby and apartment # 2L. Rather than corroborate that information, the police only briefly observed defendant stand-

ing alone outside the building. Also, Hilongos testified that he could not remember if he saw the Datsun before or after he searched defendant. Moreover, the police corroboration did not include the observation of any suspicious drug transaction or criminal activity. The police corroboration only of the suspect's description and location did not bolster the tip's reliability or add to its weight. The informant could have easily known defendant's description and location without being privy to criminal activity, and police corroboration of that neutral information does not alone or with all the surrounding circumstances suggest that defendant was engaged in criminal activity. *See Zutic, supra,* 155 *N.J.* at 112, 713 *A.*2d 1048.

Finally, we note that Hilongos's extensive experience with drug transactions did not contribute to the existence of probable cause in this case. Certain suspicious behavior may lead an experienced police officer to suspect that a person is engaged in criminal activity. *See, e.g., Arthur, supra,* 149 *N.J.* at 9, 691 *A.*2d 808. An officer's experience may enable the officer to draw inferences that an untrained, inexperienced person could not. In *Arthur,* we observed that courts should "ascribe sufficient weight to the officer's knowledge and experience and to the rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise." *Id.* at 10, 691 *A.*2d 808. However, the mere fact that an officer is experienced does not lower the quantum of evidence needed to establish probable cause. An officer's experience is only useful in establishing probable cause if the officer uses the experience to infer that a suspect is engaged in criminal activity. In this case, there was no suggestion that Hilongos used his experience to infer that defendant was selling drugs. The only observation Hilongos made was of defendant standing on the sidewalk wearing a coat and a yellow cap. His experience did not lead him to believe that such a person was engaged in criminal activity. Thus, his experience does not contribute to a finding of probable cause.

In sum, we conclude that in the totality of the circumstances, Hilongos did not have probable cause when he searched defendant. Although the informant's veracity is bolstered by one prior occasion of reliability, doubts concerning potential ulterior motives must remain. Also, the easy-to-know detail in the tip did not imply a reliable basis of knowledge. Finally, the police corroboration of that easy-to-predict detail did not bolster the informant's reliability in respect of the allegation of criminal activity. Taken as a whole, these circumstances did not amount to probable cause. Therefore, the personal search of defendant and seizure of the keys from defendant were unlawful.

### III

Because the personal search of defendant was not based on probable cause and was unreasonable, the next issue presented is whether the discovery of the drugs in apartment # 2L was based on the seizure of the keys to the apartment that were obtained as a result of the unlawful search of the defendant and, if so, whether that renders the subsequent search and seizure of evidence from the apartment unlawful.

Evidence obtained as the fruit of an unlawful search or seizure must be suppressed. *Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L. Ed.*2d 441 (1963); *State v. Barry,* 86 *N.J.* 80, 87, 429 *A.*2d 581, *cert. denied,* 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L. Ed.*2d 415 (1981); *accord State v. Sugar,* 84 *N.J.* 1, 25, 417 *A.*2d 474 (1980) (excluding all evidence derived from violation of the attorney-client privilege, because "the fruits of [law enforcement's] lawlessness must not be allowed to aid a prosecution in any manner."). Three factors determine whether subsequently obtained evidence is tainted by a prior illegality: (1) the presence of intervening circumstances between the original illegality and the challenged evidence; (2) the temporal proximity between the original illegality and the challenged evidence; and (3) the flagrancy and purpose of the police misconduct. *Brown v. Illinois,* 422

*U.S.* 590, 603–04, 95 *S.Ct.* 2254, 2261–62, 45 *L. Ed.*2d 416, 427 (1975).

Both lower courts ruled that the seizure of drugs from the apartment was reasonable because access to the apartment was based on Walker's consent. Implicit in that conclusion is that the antecedent search of defendant, which resulted in the seizure of the keys to the apartment, did not lead to or significantly influence Walker's consent.

▮▮▮ Although Walker's decision to give consent cannot be ascribed to a single reason or motive, it is clear that it was heavily influenced by the unlawful seizure of the keys from defendant. Walker knew that the police had obtained keys to her apartment from defendant, and that knowledge was a major factor in her decision to give consent to the police to enter the apartment to investigate. Thus, Walker's consent was not an independent intervening circumstance. A consent to search that is attributable to police misconduct involving the violations of constitutional rights may be regarded as the product of that unconstitutional conduct and an invalid basis on which to justify a search. *State v. Johnson,* 120 *N.J.* 263, 288, 576 *A.*2d 834 (1990) (holding that consent that grew out of an illegally obtained confession was "fruit of the poisonous tree" and thus invalid); *cf. State v. Judge,* 275 *N.J.Super.* 194, 206, 645 *A.*2d 1224 (App.Div.1994) (finding consent to search was not tainted because the police had probable cause to search without consent). With regard to temporal proximity, there was no significant delay between the seizure of the apartment keys from defendant and the elicitation of Walker's consent. Shortly after defendant was seized and searched, Walker was told that the police were currently standing outside her apartment door with a set of her keys. In light of those factors, the discovery of the drugs was a product of the unlawful seizure of the keys. Therefore, the drugs must also be suppressed.

▮▮▮ The Appellate Division also ruled that defendant had no expectation of privacy in the apartment and consequently had no standing to challenge the reasonableness of the search of the

apartment and the seizure of the drug contraband. The circumstances of this case do not require consideration of the issue of standing. *See Arthur, supra,* 149 *N.J.* at 13, 691 *A.*2d 808 (noting but not deciding issue of standing to challenge unreasonable search of another person). Where evidence is obtained as the fruit of the poisonous tree of a prior unlawful search, the defendant's right to object to its admission as evidence is rooted in the initial violation of his or her rights. In the context of this case, we need not consider whether defendant had an expectation of privacy in apartment # 2L. Defendant did have an expectation of privacy in his own person, and the discovery of the drugs in the apartment was directly related to and the clear result of the violation of that personal right. The search of defendant ultimately led to the drugs, and suppression of the drugs is necessary to protect his expectation of privacy in his own person. *See Wong Sun, supra,* 371 *U.S.* at 488, 83 *S.Ct.* at 417, 9 *L. Ed.*2d at 455 (suppressing drugs found in another's apartment because they were the fruit of a statement unlawfully obtained from the defendant); *see Johnson, supra,* 120 *N.J.* at 288, 576 *A.*2d 834.

## IV

The judgment of the Appellate Division is reversed.

PORITZ, C.J., GARIBALDI, J., and COLEMAN, J., dissenting.

We would affirm the judgment below substantially for the reasons expressed in the opinion of the Appellate Division, which is reported at 291 *N.J.Super.* 245, 677 *A.*2d 250 (1996).

*For reversal*—Justices HANDLER, POLLOCK, O'HERN and COLEMAN—4.

*For affirmance*—Chief Justice PORITZ, and Justices GARIBALDI and COLEMAN—3.