NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5760-14T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

JASON E. MOORE,

 Defendant-Appellant.
_________________________________________________

 Submitted March 28, 2017 – Decided May 16, 2017

 Before Judges Messano and Grall.

 On appeal from the Superior Court of New
 Jersey, Law Division, Cumberland County,
 Indictment No. 12-12-1139.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Rochelle Watson, Assistant
 Deputy Public Defender, of counsel and on
 the brief).

 Jennifer Webb-McRae, Cumberland County
 Prosecutor, attorney for respondent (Kim L.
 Barfield, Assistant Prosecutor, of counsel
 and on the brief).

PER CURIAM
 Defendant Jason E. Moore (defendant or Moore) appeals the

denial of his motion to suppress evidence obtained with two

search warrants. After the denial, defendant and the State

reached a plea agreement. In conformity with that agreement,

defendant pled guilty to two of the eight counts naming him in

an indictment returned by the grand jurors for Cumberland

County. Defendant was charged with crimes related to the

killing of Ervin M. Harper, the disposal of Harper's remains and

the production and distribution of marijuana. More

specifically, defendant pled guilty to count one, first-degree

aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) (amended from

murder, N.J.S.A. 2C:11-3(a)(1)-(2)); and count four, second-

degree disturbing or desecrating human remains, N.J.S.A. 2C:22-

1(a)(1).

 As agreed, the remaining charges against defendant were

dismissed. The charges were: possessing a weapon with an

unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); conspiring

with co-defendants, Lewis I. Moore and Amber M. Price, to

disturb and desecrate human remains, N.J.S.A. 2C:5-2 and

N.J.S.A. 2C:22-1 (count three); conspiring with the same co-

defendants to hinder and hindering apprehension, N.J.S.A. 2C:5-2

 2 A-5760-14T1
and N.J.S.A. 2C:29-3 (counts five and eight)1; possessing a

controlled dangerous substance, marijuana in a quantity of more

than 50 grams, N.J.S.A. 2C:35-10(a)(3) (count nine);

manufacturing, distributing or dispensing marijuana, N.J.S.A.

2C:35-5(a)(1) and -5(b)(11) (count ten); and possessing a weapon

in the course of manufacturing, distributing or dispensing

marijuana, N.J.S.A. 2C:39-4.1(a) (count eleven).

 In conformity with the State's recommendation set forth in

the plea agreement, the judge sentenced defendant to a twenty-

year term of imprisonment for aggravated manslaughter, subject

to terms of parole ineligibility and parole supervision required

by the No Early Release Act, N.J.S.A. 2C:43-7.2, and to a

consecutive five-year term of imprisonment for disturbing human

remains. Both sentences are concurrent with a sentence

defendant was then serving for drug crimes charged in Indictment

10-04-1149. The judge also imposed the appropriate fines,

penalties and assessments, and at the State's request, dismissed

the charges against defendant in the remaining counts of the

indictment and eleven open cases.

1
 Count four also charged Lewis I. Moore and Price with
desecration, 2C:22-1, and counts six and seven, respectively,
charged Price and Lewis I. Moore with hindering apprehension.

 3 A-5760-14T1
 At the time of his plea, defendant acknowledged shooting

Harper twice with a .357 handgun as Harper stood in the "side

driveway" of defendant's property. He further acknowledged

burying Harper in a wooded area of his property and later

unearthing and dismembering Harper's remains and placing them in

trash bags that he then buried in remote woods away from his

premises.

 On appeal, defendant raises two issues for our consideration.

 POINT I

 BECAUSE IT WAS BASED ON STALE INFORMATION,
 PROBABLE CAUSE DID NOT SUPPORT THE ISSUANCE
 OF THE FIRST SEARCH WARRANT. CONSEQUENTLY,
 THE SECOND SEARCH WARRANT IS ALSO INVALID AS
 THE FRUIT OF THE FIRST.

 POINT II

 BECAUSE THE SENTENCING COURT FAILED TO COMPLY
 WITH THE YARBOUGH GUIDELINES, A REMAND FOR
 RESENTENCING IS REQUIRED.

 For the reasons that follow, we conclude the information

supporting the issuance of the search warrant was not stale and

adequately supported a finding of probable cause. Further, we

determine that the judge gave full consideration to the

guidelines for consecutive sentencing established in State v.

Yarbough, 100 N.J. 627 (1985) (adopting criteria for trial

judges to consider in determining whether concurrent or

 4 A-5760-14T1
consecutive sentences are warranted), cert. denied, 475 U.S.

1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

 I.

 Two search warrants were issued — the first on February 5,

2011, and the second on March 11, 2011. Defendant submits that

the first warrant was improperly issued on stale reports of a

marijuana operation and inadequate information linking him or

his searched premises to Harper's disappearance and demise. His

only challenge to the second warrant is that it was supported by

evidence obtained with the first, and as such, the evidence

found in the second search must be suppressed as the fruit of an

illegal search. Wong Sun v. United States, 371 U.S. 471, 83 S.

Ct. 407, 9 L. Ed. 2d 441 (1963); State v. Barry, 86 N.J. 80, 87,

cert. denied, 454 U.S. 1017, 102 S. Ct. 553, 70 L. Ed. 2d 415

(1981).

 To prevail, defendant has the burden of overcoming the

presumption of validity extended to a search conducted with a

warrant; to do that, he must "prove 'that there was no probable

cause supporting the issuance'" of the first warrant. State v.

Jones, 179 N.J. 377, 388 (2004) (quoting State v. Valencia, 93

N.J. 126, 133 (1983)). In considering whether defendant met the

burden, this court must give "substantial deference" to the

discretionary determination made by the issuing judge. Jones,

 5 A-5760-14T1
supra, 179 N.J. at 388. Even if we were to find the supporting

information "marginal," we would resolve the doubt by sustaining

the search. State v. Kasabucki, 52 N.J. 110, 116 (1968) (citing

United States v. Ventresca, 380 U.S. 102, 109, 85 S. Ct. 741,

746, 13 L. Ed. 2d 684, 689 (1965)). Thus, the question is

whether the judge was presented "with facts sufficient to permit

the inference of the existence of probable cause" necessary to

issue a warrant. State v. Novembrino, 105 N.J. 95, 128 (1987).

 The issuing judge, was required "'to make a practical,

common-sense decision whether, given all the circumstances set

forth in the affidavit before him, including the 'veracity' and

'basis of knowledge' of persons supplying hearsay information,

there is a fair probability that contraband or evidence of a

crime [would] be found in'" the place or places to be searched.

State v. Smith, 155 N.J. 83, 93, cert. denied, 525 U.S. 1033,

119 S. Ct. 576, 142 L. Ed. 2d 480 (1998) (quoting Illinois v.

Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d

527, 548 (1983)). The judge had to "consider the totality of

the circumstances, and . . . deal with probabilities."

Schneider v. Simonini, 163 N.J. 336, 361 (2000) (citing Gates,

supra, 462 U.S. at 230-31, 238, 103 S. Ct. at 2328, 2332, 76 L.

Ed. 2d at 543-44), cert. denied, 531 U.S. 1146, 121 S. Ct. 1083,

148 L. Ed. 2d 959 (2001).

 6 A-5760-14T1
 The affidavit must have provided a "substantial basis" for

finding informant-accounts credible. State v. Sullivan, 169

N.J. 204, 212 (2001); accord Smith, supra, 155 N.J. at 92. In

making that assessment, an officer and a judge may assume the

veracity of concerned citizens, State v. Johnson, 171 N.J. 192,

216 (2002); recognize that detailed accounts of criminal

activity provide something more substantial than rumor,

Novembrino, supra, 105 N.J. at 121; rely on corroborating

evidence investigating officers acquired, id. at 126; consider

evidence of defendant's criminal history included in the

affidavit, State v. Valentino, 134 N.J. 536, 550 (1994); and

assign value to inferences the affiant drew based on his

experience and training that "an untrained person could not"

draw, Smith, supra, 155 N.J. at 99; see also Novembrino, supra,

105 N.J. at 126.

 Defendant's claim of "staleness" bears on whether the

totality of the information in the affidavit permitted the judge

to find "a fair probability that contraband or evidence of a

crime [would] be found" if defendant's premises were searched

during the time permitted in the warrant. Smith, supra, 155

N.J. at 93. In short, staleness is a question of whether the

probable cause still exists when the warrant is issued and at

the time of the search. State v. Blaurock, 143 N.J. Super. 476,

 7 A-5760-14T1
479 (App. Div. 1976); see also Sgro v. United States, 287 U.S.

206, 53 S. Ct. 138, 77 L. Ed. 260 (1932).

 "[T]imeliness and its converse, staleness, must be measured

by the [n]ature and regularity of the allegedly unlawful

activity." United States v. Nilsen, 482 F. Supp. 1335, 1339

(D.N.J. 1980). Thus, "'[w]here the affidavit recites a mere

isolated violation it would not be unreasonable to imply that

probable cause dwindles rather quickly with the passage of time.

However, where the affidavit properly recites facts indicating

activity of a protracted and continuous nature, a course of

conduct, the passage of time becomes less significant.'" United

States v. Harris, 482 F.2d 1115, 1119 (3d Cir. 1973) (quoting

United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972));

accord Blaurock, supra, 143 N.J. Super. at 479-80 (relying on

Harris and Johnson).

 With those standards as a guide, we turn to consider the

affidavit.

 The affiant, Detective Ryan P. Breslin, applied for and

obtained the first warrant on February 5, 2011. At that time,

Breslin was serving as a detective in the Major Crime Unit of

the Cumberland County Prosecutor's Office (CCPO). CCPO hired

Breslin in November 2007, when Breslin had about one and one-

half years of service in a local police department and had

 8 A-5760-14T1
graduated from the Vineland Police Academy. In his years with

CCPO, Breslin had investigated homicides, and had investigated

narcotics violations as a police officer. Breslin's training

included search warrant preparation, narcotics investigation,

and drug identification.

 This investigation commenced in response to a missing

persons complaint filed by Kim Jenkins. Jenkins is the cousin

of Harper, the homicide victim. She reported that neither

family members nor friends had heard from or seen Harper since

January 20, 2011. She became concerned after a conversation

with Harper's girlfriend, Queen Lindsey, who said she had last

heard from Harper on January 13 via "Facebook," and he had said

he had been in an argument with someone named "Jason."

 Jenkins had also spoken to Harper's nephew, Vernon Corbin,

also known as Vernon Blount. Vernon's mother, Ruby Blount, was

Harper's sister. Vernon told Jenkins that on January 28, "guys"

in a bar in Wildwood told him that "[t]hey got [Harper]."

Jenkins "believed Vernon was talking about members of the Blood

street gang because of a prior criminal investigation that

Harper was involved in."

 The detectives had "several interviews" with Harper's

girlfriend, Lindsey. From her, they learned that she and Harper

had been dating for about four or five years and, like other

 9 A-5760-14T1
couples, had problems that they worked out in a few days. She

had not heard from Harper since January 19, when he removed his

belongings from their apartment and went to live with Jason

Moore. She had repeatedly called Harper's cell phone number,

which she gave to Breslin. When Lindsey called, she was either

sent to voicemail or received no answer. She gave the

detectives two additional cell phone numbers for Harper.

Lindsey told Breslin it "was very unusual" that Harper had not

called her or family members since she last heard from him.

 According to Lindsey, Harper did not have a car and always

used Jason Moore's car. Lindsey reported that, Harper and Moore

were friends and business partners and, in the past, Harper had

stayed with Moore after Harper and she had argued.

 Lindsey further reported she had called Moore since January

23 to speak to Harper. When she had done that in the past,

Moore always had Harper get in touch with her. This time he did

not.

 Lindsey told Breslin that she was

 very suspicious of the stories that Moore was
 providing concerning the whereabouts of
 Harper. One of those stories was about Harper
 stealing a quantity of marijuana from Moore
 and Moore thr[owing] Harper out of the
 residence. A second story was, on Friday,
 January 21, 2011, Moore told Ms. Lindsey he
 believed Harper had been smoking marijuana and
 he was moving and talking very slowly. They

 10 A-5760-14T1
 (Moore and Harper) had gotten into an argument
 over money or a cell phone bill and Harper
 took a gun and left the residence. According
 to Moore, that was the last time he saw Harper
 (Friday, January 21, 2011).

 When Ms. Lindsey asked about Harper's
 clothing and pet dog, Moore told her Harper
 left all of his clothing at the residence and
 as a result of their argument he (Moore) shot
 the dog. Lindsey then told [the detectives]
 that he (Moore) later told her he didn't shoot
 the dog, he just let it go.

 Lindsey advised Breslin that Harper had a silver-colored

semi-automatic handgun. Although she had not seen Moore with a

handgun, she suspected he had one because of what he said about

shooting Harper's dog.

 Lindsey knew about the Moore/Harper marijuana-distribution

partnership. She said Moore grows marijuana in a garage on his

property in Delmont, and Harper is one of his distributors.

They had been in that business together since April or May 2010.

 During the week of January 1, 2011, she went to Moore's

house with Harper, and he showed her the indoor grow operation

in Moore's garage. She described the "grow operation" located

"in a hidden room in the garage with numerous lights on the

ceiling," about twenty-five marijuana plants were growing "in

what she described as five gallon buckets." And, there were

pipes leading to the plants and an area with smaller "starter"

 11 A-5760-14T1
plants. The marijuana plants "were approximately three feet

tall and bushy."

 Lindsey further advised Breslin that during a conversation

with Moore a week earlier, Moore asked if she planned to call

the police and to let him know if she did, "because he needed to

'clean up' a few things[,] and he really needed until the first

week or March to finish up." Breslin wrote, "[Lindsey] believes

he was referring to the marijuana grow and the growth of

plants."

 Breslin explained why he believed the grow operation was

ongoing:

 Based on training, education and
 experience of this officer and the officers
 involved . . . , we believe that information
 provided by Ms. Lindsey is consistent with an
 on going indoor marijuana grow. These facts,
 coupled with Ms. Lindsey's recent
 conversations with Moore about contacting the
 police[,] leads this detective and the
 detectives working on the investigation to
 believe that the indoor grow is occurring at
 this time. This information is consistent
 with the growth cycle of a marijuana grow and
 the maturity of the plants. The longer the
 plants are allowed to grow the greater the
 potency of the marijuana, and . . . the
 economic value of the product.

 Breslin acquired other information about Harper's

involvement in the marijuana business with Moore. According to

Lindsey, "Harper plays a big role in the distribution of

 12 A-5760-14T1
marijuana from Moore," and she has personal knowledge of Harper

getting multiple pounds of marijuana at a time from Moore and

breaking them down into one ounce packages, which Harper would

distribute to various people. She further indicated, "Harper

was making a lot of money" and using it to take care of "her,

his son . . . and pay bills. Knowing all of this information

about the marijuana distribution also concerns Ms. Lindsey that

Moore is being evasive and inconsistent about Harper's

whereabouts."

 Iesha Clark, the mother of Harper's son, spoke to Breslin

on February 4, 2011. She was "familiar with Harper selling

large quantities of marijuana with Moore, but could not go into

specific details because of the children being present." Clark

had last seen Harper on January 20 when he met her, took their

son for dinner and returned him to her as planned. Clark told

the detective that Harper was driving a gray Mazda that day and

said it belonged to Moore. Clark advised that was "very unusual

[for] Harper [to have] not contacted her since that date."

 After receiving authorization, the detective checked all

the cell phone numbers he had been given for Harper. Because

the live global position of the phones showed no results, the

detective believed they were powered off. Call detail records

for the numbers "came back on [one] cell phone number . . . .

 13 A-5760-14T1
The other numbers had no activity." The last of the calls

retrieved came during the late morning of January 22, and all

those calls were directed to voicemail. "There were no outgoing

phone calls made and there was no cell site tower information

provided."

 The detective received approval from the County Prosecutor

to record a phone call from Lindsey to Moore, with Lindsey's

consent, however, Moore did not answer. While the police were

with Lindsey for the unsuccessful intercept, she received phone

calls from relatives of Vernon, reporting that he was calling

people and saying that Harper's body had been found.

 Later, Ruby Blount called Breslin. She reported that she

had been speaking with Harper more frequently since her son

Vernon moved to New Jersey, and she said Harper had not been

returning her calls. She reported that the last time they

spoke, Harper was "stressed out" over his on-again off-again

relationship with Lindsey and with Jason Moore, who "sells

'weed' and . . . gave Vernon enough 'weed' to get him on his

feet." Ruby explained that Moore's involvement with Vernon

"bothered Harper and he was trying to keep Vernon away from that

activity." Harper had told her "he was living in Moore's

basement," "using Moore's cars to get around," and working as a

 14 A-5760-14T1
partner of Moore's, who "had things in his house to grow and

sell marijuana."

 Ruby also told Breslin that Vernon called her on January 29

and told her Harper was missing. Ruby called Moore, who told

her that he had let Harper stay in his house, but "put [him]

out" because things were missing. She also said she had been to

Moore's residence in 2008, which was in a "very rural" area.

 Moore's criminal records disclosed a prior arrest in 2008

for an "indoor hydroponics marijuana grow in the garage" at a

residence in Delmont, New Jersey, which is the address of

defendant's premises identified in the search warrants at issue

here.

 The detectives also tried but failed to find Harper by

contacting local medical facilities in Cumberland, Atlantic and

Cape May Counties, the State Medical Examiner, and county

correctional facilities throughout the State. None reported any

contact with Harper.

 On the information summarized above, Breslin believed there

was probable cause for a warrant authorizing a search of the

premises, house and garage and the silver Mazda registered to

Moore for evidence of Harper's homicide, aggravated assault,

criminal restraint, or kidnapping, and for evidence of marijuana

possession, cultivation, and distribution.

 15 A-5760-14T1
 Mindful of our deferential standard of review, we conclude

that Breslin's affidavit contained ample evidence to support

issuance of a warrant authorizing the search of defendant's

home, garage and silver Mazda for evidence of marijuana

distribution and crimes related to Harper's unexplained

disappearance. The citizens who provided information were

persons concerned about Harper, because he had broken off

regular communications with them abruptly and without

explanation. Their consistent accounts of the approximate date

of their sudden loss of customary communication with Harper gave

Breslin sufficient reason to believe Harper was a victim of a

violent crime. Especially after an independent investigation

ruled out other probable and less sinister explanations, such as

hospitalization or incarceration.

 In addition, these concerned individuals were repeating

Harper's disclosures of trouble between him and defendant

related to the marijuana business and defendant's involvement of

Vernon. Those details, repeated by Harper's confidants, gave

substantial reason to credit their information, and their

information pointed to defendant.

 There was additional corroborated information of trouble

between Harper and defendant. Defendant gave the citizen-

informants, who contacted him to inquire about Harper,

 16 A-5760-14T1
inconsistent explanations about the problems that led defendant

to put Harper out of his home and for Harper to leave without

his belongings. Defendant's accounts, albeit inconsistent,

suggested Harper was at fault. Defendant even told Lindsey he

had shot Harper's dog, which suggested defendant had a firearm,

and then said he had just let the dog go. Moreover, the

investigators obtained cell phone records that confirmed the

informants' accounts of when Harper went missing and stopped

answering his phone.

 All of that provided ample support for "a practical,

common-sense decision" that the totality of the circumstances,

"including the 'veracity' and 'basis of knowledge' of persons

supplying hearsay information," supported a determination that

there was "a fair probability" that "evidence of a crime"

against defendant would be found on his premises. Smith, supra,

155 N.J. at 93.

 The information in the affidavit provided the same quality

and quantity of information establishing a fair probability that

evidence of marijuana distribution would be found on defendant's

premises and in the vehicle he allowed Harper to use. Lindsey's

detailed account of what she saw in defendant's garage during

the first week of January demonstrated the basis for her

knowledge about the "grow" facility. Similarly, her living with

 17 A-5760-14T1
Harper for several years made her well-situated to observe and

report Harper's packaging and distribution of marijuana and his

access to sufficient funds to support her and Harper's son.

Again, her description of his business was corroborated by the

independent statements of the relatives and friends who, based

on conversations with Harper, were well-aware of the nature of

his partnership with defendant.

 We agree with the judges who issued the warrant and denied

the motion to suppress that the affidavit contained information

establishing a fair probability that evidence of the marijuana

production and distribution would be found on defendant's

premises on February 5, when the warrant was issued. The

information was not stale.

 Lindsey's detailed report of what she saw in the garage in

the first week of January, viewed with the other evidence,

indicated an ongoing marijuana operation at the time of Harper's

disappearance. That operation involved ceiling lights and

pipelines that defendant would not likely have been able to

dismantle and conceal by February 5. After all, defendant asked

Lindsey for notice of any call she made to the police so he

could clean up. Additionally, the inference Breslin drew about

the marijuana grow-cycle, which was based on his training and

experience, and inference available from defendant's prior

 18 A-5760-14T1
arrest during the execution of a warrant authorizing a search of

the garage on this property in 2008 and its disclosure of a

hydroponic-marijuana grow operation further supported that

conclusion. The affidavit provided a substantial basis to

believe that evidence of the marijuana business Lindsey saw in

early January most likely would be there in early February.

 For all of the foregoing reasons, we conclude that

defendant failed to establish that the first warrant was

obtained with stale information of a crime related to marijuana.

Furthermore, there was sufficient information to establish

probable cause that evidence of a crime against Harper would

probably be found in the search of defendant's premises and the

vehicle he allowed Harper to use. Thus, the evidence obtained

during the search authorized by that warrant was lawfully

recovered, not tainted.

 Because defendant's lone challenge to the second warrant

depends solely on the invalidity of the first, we have no reason

to address the second affidavit.

 II.

 Defendant argues that the judge imposed consecutive

sentences for aggravated manslaughter and desecration of human

remains without addressing the guidelines for exercise of that

discretion established in Yarbough. Contrary to defendant's

 19 A-5760-14T1
claim, the judge provided a statement of reasons addressing

those guidelines. The Yarbough factors are:

 (1) there can be no free crimes in a system
 for which the punishment shall fit the crime;

 (2) the reasons for imposing either a
 consecutive or concurrent sentence should be
 separately stated in the sentencing decision;

 (3) some reasons to be considered by the
 sentencing court should include facts relating
 to the crimes, including whether or not:

 (a) the crimes and their objectives were
 predominantly independent of each other;

 (b) the crimes involved separate acts of
 violence or threats of violence;

 (c) the crimes were committed at different
 times or separate places, rather than being
 committed so closely in time and place as to
 indicate a single period of aberrant behavior;

 (d) any of the crimes involved multiple
 victims; [and]

 (e) the convictions for which the sentences
 are to be imposed are numerous . . . .

 [State v. Zuber, 227 N.J. 422, 449 (2017)
 (listing the Yarbough guidelines).]

 At sentencing, the judge found that these two crimes

deserved more punishment than one and noted that there should be

no free crimes. He considered the separateness of aggravated

manslaughter and the disturbing of human remains and concluded

these separate crimes were "predominantly independent of each

 20 A-5760-14T1
another." They clearly were. Defendant killed Harper by

shooting him twice. Subsequently, he buried Harper's body in a

wooded area of his property and covered that site with cement.

Later, he dug up the cement, dismembered the body and moved it

in trash bags to a remote site in the woods. In addition, the

judge found that defendant's disturbance of Harper's remains was

motivated by a purpose independent of the shooting — avoiding

detection and responsibility for killing Harper. The judge

further found these were separate acts of violence, committed

with different weapons, at different times and in different

places. All of those determinations were supported by the

record.

 Although the judge did not address the factor on multiple

victims, Harper was the victim of the homicide and disturbing

human remains is a crime against public order and human

sensibilities. This Yarbough factor had no apparent relevance

here. Even if the judge erred by not saying that, the omission

is of no import on these facts, because there is no reasonable

interpretation of the multiple-victim factor that could

reasonably be viewed as favoring concurrent sentences here.

 Similarly, the judge did not expressly address the factor

referencing the number of crimes for which defendant was being

sentenced. That is explained by the fact that the judge was

 21 A-5760-14T1
sentencing defendant for only two crimes; the State's agreement

to dismiss the six counts charging other crimes made this factor

irrelevant.

 Having considered defendant's arguments in light of the

judge's findings and statement of reasons, we have concluded

that they have insufficient merit to warrant any additional

discussion in a written opinion. R. 2:11-3(e)(2). The judge's

findings on and balancing of the aggravating and mitigating

factors are supported by adequate evidence in the record, and

the sentence is neither inconsistent with sentencing provisions

of the Code of Criminal Justice nor shocking to the judicial

conscience. See State v. Bieniek, 200 N.J. 601, 608 (2010);

State v. Cassady, 198 N.J. 165, 180-81 (2009).

 Affirmed.

 22 A-5760-14T1