**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3392-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARIEN L. MARTIN, a/k/a
DARREN L. MARTIN,

     Defendant-Appellant.

_____

Submitted November 8, 2021 – Decided January 31, 2022

Before Judges Sabatino, Rothstadt, and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 15-12-0598.

Joseph E. Krakora, Public Defender, attorney for appellant (Melanie K. Dellplain, Assistant Deputy Public Defender, of counsel and on the briefs).

Kristin J. Telsey, Acting Salem County Prosecutor, attorney for respondent (David M. Galemba, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Darien L. Martin appeals from his conviction and sentence to an aggregate term of ten years, which were entered after he pled guilty to two second-degree and one third-degree drug offenses. On appeal, he argues the following two points:

POINT I

THE COURT ERRED WHEN IT DENIED [DEFENDANT'S] SUPPRESSION MOTION, THEREBY DEPRIVING HIM OF HIS CONSTITUTIONAL RIGHTS AGAINST UNREASONABLE SEARCH AND SEIZURE.

A. THE NO-KNOCK PROVISION OF THE JULY 21, 2015 SEARCH WARRANT FOR [DEFENDANT] AND HIS RESIDENCE WAS INVALID, SO THE ENSUING SEARCH OF MARTIN'S RESIDENCE WAS ILLEGAL AND THE FRUITS OF THAT SEARCH MUST BE SUPPRESSED.

B. THERE WAS NO PROBABLE CAUSE TO SUPPORT THE INITIAL [COMMUNICATION DATA WARRANT (CDW)], RENEWAL CDW, AND WIRETAP ORDER, SO ALL EVIDENCE OBTAINED AS A RESULT OF THE INITIAL CDW, RENEWAL CDW, AND WIRETAP ORDER MUST BE SUPPRESSED.

POINT II

[DEFENDANT'S] SENTENCE IS EXCESSIVE BECAUSE THE SENTENCING COURT FAILED TO DISTINGUISH THIS OFFENSE FROM OTHERS IN

2

ITS CLASS WHEN IT WEIGHED AGGRAVATING
FACTOR NINE.  (NOT RAISED BELOW).

We are not persuaded by these contentions.  For the reasons stated in this opinion, we affirm the denial of defendant's motions to suppress and his sentence.

I.

We summarize the facts leading to defendant's arrest and conviction as follows.  In January 2014, Senior Investigator Ryan Donelson of the Salem County Prosecutor's Office (SCPO) received information from a confidential informant (CI) about defendant selling cocaine in Salem City.  Donelson, who became the lead investigator into the allegations, was familiar with defendant from prior related investigations involving the distribution of controlled dangerous substances (CDS).

As part of Donelson's investigation, on April 2, 2015, he successfully applied for a CDW, relying upon information from a CI and Donelson's experiences with and knowledge about defendant's drug dealing, which by then included recent controlled purchases of CDS through the CIs' participation.  The CDW was later renewed and a wiretap order was issued based on information gleaned from the initial wiretaps.

A-3392-18

Later, in July 2015, Donelson used similar information and facts developed through the CDW to secure a search warrant for defendant's residence located on Carpenter Street in Salem. When Donelson applied for the search warrant, he did not specify on his affidavit that he was requesting a "no-knock entry" warrant.[1] However, the warrant indicated a "'no[-]knock' entry request" was "[a]pproved." (Emphasis omitted).

The search warrant was executed on July 27, 2015, at 8:55 a.m. It resulted in discovery of paraphernalia associated with the possession and distribution of CDS but not any CDS.

Information developed through Donelson's investigation also revealed defendant was using the Magnolia Street home of a codefendant, Lisa Wilson, to store CDS. Police conducted a search of her home, which yielded the discovery of a safe that Wilson explained belonged to defendant. Donelson later secured a warrant to seize and search the safe, inside which large quantities cocaine were discovered.

Based on the discovery of the CDS and the information developed through Donelson's investigation, police arrested defendant. He and thirteen codefendants were later charged in an indictment with having committed

_____

[1] The State acknowledges this fact on appeal.

A-3392-18

numerous CDS distribution offenses. After his indictment, defendant filed many motions. Pertinent to this appeal were his motion to suppress evidence obtained in the search of his residence, and a motion to suppress evidence obtained through the CDWs and wiretap order.

The trial court conducted an evidentiary hearing as to both on June 8, 2017. After the presentation of the evidence, the trial court denied the motion related to the search. As to defendant's challenges to the CDWs and their execution, the trial court conducted additional hearings through 2017. On February 14, 2018, after considering the parties' oral arguments, the trial court also denied the motion as to the CDWs.

After the denial of his motions, on July 6, 2018, defendant pled guilty to third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1), and two counts of second-degree conspiracy to possess with intent to distribute CDS in a quantity of one-half ounce or more but less than five ounces, N.J.S.A. 2C:35-5(b)(2). On August 3, 2018, the trial court sentenced defendant pursuant to his negotiated plea agreement. Later, the trial court corrected an issue regarding the merger of two offenses and on August 15, 2018, entered a Judgment of Conviction that reflected defendant's aggregate ten-year term, subject to a five-year period of parole ineligibility. This appeal followed.

II.

We begin our review by addressing defendant's challenge to the trial court's order denying his motion to suppress the evidence seized at his residence. According to defendant, the search warrant was improperly granted, requiring reversal of his conviction because the search warrant's no-knock provisions were not requested by Donelson and the affidavit did not support a no-knock entry. Relying primarily on State v. Johnson, 168 N.J. 608, 615 (2001), he argues the warrant was invalid, and the resulting search was illegal, mandating reversal of his conviction and suppression of the evidence obtained in the search of his home. We disagree.

A.

On July 21, 2015, Donelson submitted an affidavit in support of a search warrant application,[2] which was granted the same day. It is undisputed that although he did not explicitly request a no-knock entry in his affidavit, the warrant indicated that an application for that procedure had been approved.

In his supporting affidavit, Donelson detailed the wiretap investigation and the phone calls that investigators believed were discussions about the sale of narcotics, which included defendant directing the caller to meet him on

_____

[2] The record does not contain the application form, only the affidavit.

Carpenter Street. In one call, defendant discussed carrying a gun and a prior incident where he committed a robbery. The affidavit also detailed defendant's criminal history, including nine arrests and seven felony convictions for hindering, distribution of cocaine (twice), unlawful possession of a weapon, robbery, distribution of narcotics, and possession of a controlled dangerous substance.

At the suppression hearing, Donelson was the only witness. There was no evidence adduced as to whether the officers entered defendant's residence without knocking or otherwise announcing their presence. Moreover, defense counsel never made any inquiry during cross-examination about how the warrants were executed. Nevertheless, defense counsel argued that, because Donelson did not request a no-knock entry, granting it was a violation of defendant's rights and that "the search and seizure of [defendant], the arrest of him in his home[,] and the taking of any materials from the home [was] improper based on the no-knock warrant."

In denying the motion, the trial court explained the warrant and the affidavit were presented to the judge simultaneously. The court further explained, in this case, "the warrant clearly state[d] the request for the no-knock entry was approved," but defendant was "correct that there [was] no written

7

request for a no-knock entry in the affidavit." However, the court considered the "summary of electronic surveillance and interceptions," including "surveillance of [defendant] going to and from the location to be searched; a recitation of some of the conversations intercepted, including one in which defendant describe[d] committing an armed robbery and claims to have hit the victim over the head with a 357 firearm." Additionally, the court highlighted that the affidavit listed defendant's prior convictions—including three prior distributions of CDS charges, hindering, robbery, and unlawful possession of a weapon. Therefore, the court concluded the affidavit "most certainly provided sufficient details to support a finding that circumstances existed to justify issuance of a no-knock warrant."

B.

We begin by noting, in our review of a trial court's denial of a suppression motion, we will "uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" Robinson, 200 N.J. at 15

8

(alteration in original) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). However, "[t]o the extent that the trial court's determination rests upon a legal conclusion, we conduct a de novo, plenary review." Rockford, 213 N.J. at 440.

In our review of a matter that challenges the bona fides of a search warrant, we accord substantial deference to a court's decision to issue a search warrant. State v. Keyes, 184 N.J. 541 (2005). "[O]nce the State establishes that the search warrant was issued in accordance with the procedures prescribed by the rules governing search warrants," "[a] search based upon a warrant is presumed valid," and defendant bears the burden to prove "there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable." State v. Valencia, 93 N.J. 126, 133 (1983).

With these guiding principles in mind, we consider whether a search warrant is rendered a nullity because it included a no-knock provision that was not requested by law enforcement. We conclude it does not.

"There are two types of warrants police can request: a no-knock warrant and a knock-and-announce warrant." State v. Caronna, __ N.J. Super. __, __ (App. Div. 2021) (slip op. at 23). "[T]o justify a no-knock warrant, a police officer, under the totality of the circumstances and based on his or her experience and knowledge, 'must have a reasonable, particularized suspicion

9

that a no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence.'" Ibid. at 24 n.17 (quoting Johnson, 168 N.J. at 619).

A no-knock warrant is an exception to well-established Fourth Amendment principles, that the police must knock-and-announce their presence before executing a warrant.[3] Johnson, 168 N.J. at 615-16. "The knock-and-announce rule protects 'human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident.'" Caronna, __ N.J. Super. __ (slip op. at 41) (quoting Hudson v. Michigan, 547 U.S. 586 (2006)). "Suffice it to say that the rule safeguards against violence to occupants of the residence, and importantly, likewise protects police officers themselves." Id. at 41-42. However, the knock-and-announce requirement is "not absolute." State v. Jones, 179 N.J. 377, 397 (2004). In general, reasons to ignore the requirement when executing a warrant are inclusive of the justifications to grant

_____

[3] As of December 7, 2021, Acting Attorney General Andrew J. Bruck announced Attorney General Law Enforcement Directive No. 2021-12, which provides guidance to prosecutors and law enforcement officers on the application and execution of warrants containing a "no-knock" provision. This new directive creates narrower restrictions on the conditions that would support a successful application of a no-knock warrant. These narrower restrictions were not in force at the time of the application of the warrant defendant contests, and, therefore, not applied to defendant's appeal.

a no-knock warrant, and also include exigent circumstances. Caronna, __ N.J. Super. __ (slip op. at 7 n.4) (citing Robinson, 200 N.J. at 14) (affirming trial court granting a suppression motion where the police ignored a knock-and-announce requirement in a valid search warrant because there was no dispute that no exigent circumstances or other justification existed such as to justify a no-knock entry).

The Court, in Johnson, noted "the task of courts evaluating the propriety of a no-knock provision is to determine whether the applying officer has articulated a reasonable suspicion to believe that one or more exceptions to the knock-and-announce rule are justified." 168 N.J. at 618. The Court clarified "there must be some indication in the record that the applying officer articulated his or her reasonable suspicions to justify the no-knock provision before the issuing court can consider and ultimately approve that form of entry." Id. at 623 (emphasis added). "[T]he applying officer must state the specific reasons for departing from the knock-and-announce rule to the satisfaction of the reviewing court." Id. at 624 (emphasis added).

After Johnson, in Jones, the Court addressed the issue of "officer safety" as it affected the validity of a no-knock warrant. 179 N.J. at 397. The Court explained "'boilerplate' police concerns" are insufficient. Id. at 398. Instead, to

justify no-knock entry, there must be case-specific "objective facts" that amount to "a reasonable suspicion of a heightened risk to officer safety." Ibid. The Court stated "[s]everal factors, alone or in combination, may provide sufficient justification to dispense with the knock-and-announce requirement," regardless of a suspects inclination for violence or criminal history, including an informant's tip about the presence of weapons, an officer's knowledge of a suspect's violent criminal history coupled with information from an informant that the suspect still exhibits violent behavior, or the layout of an apartment where one of the occupants has had a violent criminal past. Id. at 400-01. And, where a suspect had multiple drug convictions and faces a possible extended term, the greater potential for resisting arrest is relevant, because of the "strong incentive to resist capture by the police." Id. at 408.

Where the no-knock application is based upon the destruction of evidence, "the police must articulate some reason specific to the crime, to the person under investigation, or to some other permissible factor, that leads them reasonably to believe that destruction of evidence is more than a hypothetical possibility." State v. Carlino, 373 N.J. Super. 377, 387 (App. Div. 2004).

Many cases involving no-knock provision disputes have turned on the question of whether the applying officer's affidavit specified facts that were

particularized to the circumstances to justify no-knock entry.  See, e.g., Jones, 179 N.J. at 407-08 (holding affidavit supported a no-knock warrant where officer included facts about an individual believed to be at the location to be searched who had a seven-year-old arrest for assault on a police officer).  The crux of these disputes was whether the particular facts in the affidavit were enough to support entry—not whether the officer requested the provision and provided a reason why he or she had that suspicion.  In all these cases, unlike the case now before us, the officer made an explicit request for no-knock entry and stated reasons why the request should be granted.

Here, it is undisputed that Donelson did not make an explicit request for a no-knock provision in his affidavit, nor did he explicitly state the reasons why he believed no-knock entry was required.  Defendant does not point to any authority, nor have we been able to find any, that specifically addresses a situation where issuing a no-knock warrant was not based upon an officer's explicit request for no-knock entry in the affidavit itself.[4]  However, in his affidavit, Donelson stated extensive facts regarding defendant's criminal history, ongoing drug activity, and about a conversation during which defendant spoke

---

[4]  Defendant does not argue the no-knock entry provision is an irregularity on this warrant or that it was included in bad faith, and no facts in the record would support such an argument.

about possessing a gun and using it in a prior robbery. Therefore, as the trial court did here, we can determine from the affidavit submitted in support of the application for the search warrant that Donelson articulated valid reasons for seeking a no-knock warrant.

Those facts alone do not answer the question as to whether the police in this case acted upon the unrequested no-knock provision in the warrant or if they announced their arrival on the premises when they executed the warrants. As the Johnson Court explained, "we reaffirm the existing tenet that 'in deciding whether the facts and circumstances of a particular entry justify dispensing with the knock-and-announce requirement, the trial court must make a fact-specific and fact-sensitive inquiry as to whether the entry was justifiable under [the] circumstances." 168 N.J. at 624. And, as we explained in Caronna, "the method of entry into the dwelling is an important factor to consider when evaluating the reasonableness of police action and the applicability of the exclusionary rule." Caronna, __ N.J. Super. __ (slip op. at 40) (citing Johnson, 168 N.J. at 616). As with other cases involving Fourth Amendment protections and the execution of a valid warrant, there are no hard and fast rules. Rather, the cases turn on the facts relating to the execution of the challenged warrant. See Rockford, 213 N.J. at 443 ("Courts should evaluate the execution of each warrant in its factual

14

context, 'largely avoiding categories and protocols for searches.'" (quoting United States v. Banks, 540 U.S. 31, 35 (2003))).

As no one even asked Donelson at the suppression hearing about how the police executed the warrant. We can only assume that defendant, who raised the issue about the warrant granting no-knock authority without Donelson asking for it, never raised an issue about the manner of execution before the trial court. Therefore, we assume there was no issue with the manner of execution, and the only challenge was to the warrant granting no-knock authority, which we conclude was supported by the information supplied by Donelson. In the event the warrant was indeed executed by a no-knock entry, Donelson demonstrated a reasonable, particularized suspicion that a no-knock entry is required. See Caronna, __ N.J. Super. __ (slip op. at 7 n.4). Under these circumstances, we have no cause to reverse the denial of defendant's suppression motion.

## III.

We turn our attention to defendant's contention that both CDWs and the wiretap order were granted without probable cause and, therefore, the evidence against him should have been suppressed. Specifically, he argues the wiretap communications, drugs and drug paraphernalia, and the incriminating

15

statements made by his codefendants all must be suppressed, and his convictions be reversed. In support of this argument, he contends that both of Donelson's affidavits relied on hearsay from CIs, that the affidavits did not show that the informants were reliable, and that Donelson impermissibly relied upon defendant's criminal history. We again disagree.

## A.

As already mentioned, Donelson obtained from a CI a cellular phone number that was believed to be used by defendant. Donelson submitted an affidavit as part of an application for a CDW, seeking to obtain phone records that would show the activation date, the account status, and cell site information for the phone number. The affidavit also sought to "access all incoming and outgoing dialed numbers[, ]cell site information . . . [and] subscriber information for all telephone numbers received from said records." Donelson claimed the information obtained through this warrant would "provide evidence as to the identities and location of individuals involved" in the criminal offenses.

In support of this request, Donelson stated in his affidavit that over recent years, the SCPO and Salem Police Department (SPD) received information, which came from CIs, anonymous sources, and other law enforcement personnel, about defendant and his possible involvement in narcotics trafficking.

16

Donelson included a description of several recent controlled CDS purchases that a reliable CI, designated as CRI-331 made from defendant. Donelson also described how, when he accompanied CRI-331 while undercover to purchase CDS from defendant, defendant refused to deal with him because he did not know Donelson.

After considering Donelson's affidavit and application, the court issued a CDW, authorizing the investigative agencies and Donelson to secure the information they sought through the CDW. After obtaining that information, an analysis of the call detail record revealed that a total of 4,063 calls were placed from or received by the cell phone number during the period of surveillance.

An application for a renewal CDW and a wiretap order was made by Donelson on June 26, 2015.[5] This application sought, among other things, an

---

[5] At times the parties refer to this as the second CDW. However, a CDW is different from a wiretap order. State v. Finesmith, 408 N.J. Super. 206, 211-12 (App. Div. 2009). "A wiretap order permits the interception by law enforcement of a communication contemporaneous with the transmission while a CDW is directed to acquisition of communications in post-transmission electronic storage kept by an electronic communication service or remote computing service for reasons of backup protections for the communication." Id. at 211-12. An application for a CDW also requires a showing of probable cause; however, unlike a wiretap order, a CDW does not require a showing of necessity because normal investigative procedures have failed. Id. at 212; see also N.J.S.A. 2A:156A-29 (CDW requirements for access). To be clear, the police first obtained a CDW and examined the phone records of calls. Later, it applied for and was granted a renewal CDW and the wiretap order.

A-3392-18

order authorizing the "interception of wire and electronic communications of [defendant], and other as yet unidentified individuals, engaging in, and whose communications are evidential of, the specified crimes." The application also sought authorization to intercept text messages, calls, and other data communication events. The application requested interceptions for no longer than twenty days.

In his supporting affidavit, Donelson recounted the investigation of defendant, who had been "on the Salem County Law Enforcement investigative radar" since 2007. Since that time, a "myriad" of investigative methods had been used to "cease [defendant's] extremely organized narcotics distribution activities and network." These methods included the use of CIs, controlled buys, surveillance, an attempt to introduce an undercover officer to defendant, and the installation of pole cameras.

As to the investigation efforts, Donelson explained that "[i]nformation and intelligence was received from numerous [CIs], whose information have proven truthful and reliable in the past and which has [led] to the arrest and conviction of narcotics traffickers," and that defendant was "part of an organization operating a large narcotics distribution ring within [Salem County]." However,

Donelson continued, defendant evaded serious convictions for "various reasons."

Donelson recounted that in February 2007, a CI, designated as CI #1, provided information that defendant was distributing cocaine from his residence. According to Donelson, CI #1 was "proven reliable in the past by providing information which [was] independently corroborated by other sources" and law enforcement, and CI #1 indicated he/she observed large quantities of cocaine inside defendant's residence. The information provided by CI #1 led to defendant's arrest, conviction, and sentence in 2008.

As to the then-current investigation, Donelson explained that in January 2014, a CI, referred to by Donelson as CI #2, contacted defendant by phone and arranged for controlled purchases of CDS from defendant. In February 2014, Donelson worked with yet another CI, designated as CI #3, to arrange additional controlled purchases.

The investigation continued in February 2015, when a fourth confidential informant, CI #4,[6] tried to introduce an undercover police officer to defendant.

---

[6] It is not completely clear from the record that CI #4 and CRI-331 are the same person, however between the two affidavits, Donelson reports the same conduct during the same time frame. Specifically, both CI #4 and CRI-331 attempted to introduce an undercover police officer to defendant. We assume that those descriptions refer to the same person.

19

Donelson recounted the same controlled buys as previously discussed in the warrant application for the first CDW. During the week of May 25, 2015, Donelson met with CI #4, who conducted an additional controlled buy with defendant.

Donelson also recounted obtaining the first CDW, and explained the results of that warrant, which revealed a total of 4,063 calls were placed or received by the phone number believed to belong to defendant for the period of February 16, 2015 through April 2, 2015. Donelson listed the results, including the phone numbers the calls were made to or received from, the name of the person who was registered to each phone number, the phone user's criminal history, and whether the SCPO was familiar with that individual. The application also detailed defendant's criminal history and the investigative techniques used by law enforcement that failed, or techniques, such as search warrants and interviews, not used because they would alert the subjects of a police investigation. An order granting the wiretap and renewing the CDW was issued, and on July 17, 2015, a renewal order was granted for ten more days of surveillance.

At the June 8, 2017 suppression hearing, Donelson testified about his involvement in applying for the CDWs and wiretap orders and, after the warrants

and orders were issued, his later gathering of the information obtained from the CDWs. On cross-examination by a codefendant's counsel, Donelson said that prior to making the application for the CDW, he used CIs, surveillance, and pole cameras, and that the investigators "exhausted" all their investigative techniques prior to obtaining the wiretap order. Moreover, although defendant's number was provided by CIs, Donelson did not confirm the phone number belonged to defendant prior to obtaining the CDW.

Defense counsel did not ask Donelson about his affidavit or any suspicions Donelson may have had while applying for the search warrant. He did ask about the training given to the monitors on surveillance, whether reports existed detailing the controlled buys, and confirmed that Donelson did not have prior contact with defendant before the investigation.

After the June 2017 hearing, the trial court held additional hearings that year to further address defendant's challenges to the CDWs, wiretap orders, and their execution, including on minimization issues. On February 14, 2018, the trial court considered oral argument on the issues of authentication of the recordings, admission of the wiretaps, and sealing of the wiretaps. As to the suppression issue, the trial court asked defendant's counsel about the motion to suppress the results of the CDW, and defendant's counsel, who was not joined

21

by codefendant's counsel in this particular motion, stated that he would "rest on the papers" because he thought "the argument [was] clearly laid out." The State also relied on the papers.

The trial court then denied the motion, stating the following:

> On the CDW the allegation is that the affidavit submitted in support of it was legally insufficient. And [a] CDW requires a showing of probable cause in order for a warrant to be issued.
>
> A law enforcement officer must present specific and articulable facts showing that there are reasonable grounds to believe that the record or other information is relevant and material to an ongoing criminal investigation.
>
> The CDW application details specific controlled b[uys] conducted by the confidential informants through [defendant's] alleged cell phone number.
>
> The details provided specific and articulable facts from which to conclude that the information sought by the CDW would be relevant and material to an ongoing criminal investigation and, therefore, the motion to suppress the results of the CDW is denied.

An order denying the motion to suppress "any and all statements, text or similar communication obtained by the State pursuant to multiple CDW[s] and electronic surveillance orders" was entered on February 15, 2018.

22

B.

"Article I, Paragraph 7 of the New Jersey Constitution guarantees that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause.'" State v. Manning, 240 N.J. 308, 327-28 (2020) (alteration in original) (quoting N.J. Const. art. I, ¶ 7).  This protection extends to "not only physical searches but also electronic interception of phone conversations." State v. Feliciano, 224 N.J. 351, 367 (2016).  "Because phone records are protected by Article I, Paragraph 7, law-enforcement officers must secure a warrant or court order from a judicial officer authorizing the search of such records . . . ."  Manning, 240 N.J. at 328.

Under New Jersey's Wiretap and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-10(a), a court may grant a wiretap if it finds probable cause to believe:

> a. The person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an [enumerated] offense . . . ;
>
> b. Particular communications concerning such offense may be obtained through such interception;

c. Normal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; [and]

d. Except in the case of an application meeting the requirements of [N.J.S.A. 2A:156A-9, the roving wiretap provision], the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual.

[Feliciano, 224 N.J. at 368 (alterations and omissions in original).]

Our Supreme Court stated the probable cause standard "is not susceptible of precise definition." State v. Moore, 181 N.J. 40, 45 (2004) (citing State v. Wilson, 178 N.J. 7, 13 (2003)). Generally, "it 'means less than legal evidence necessary to convict though more than mere naked suspicion.'" State v. Sullivan, 169 N.J. 204, 210-11 (2001) (quoting State v. Mark, 46 N.J. 262, 271 (1966)). Probable cause will be found to exist "if at the time of the police action there is 'a "well grounded" suspicion that a crime has been or is being committed.'" Id. at 211 (quoting State v. Waltz, 61 N.J. 83, 87 (1972)). The probable cause standard is a "common-sense, practical standard for determining the validity of a search warrant." State v. Novembrino, 105 N.J. 95, 120 (1987).

In determining whether probable cause exists, courts analyze the totality of the circumstances test, as set forth in <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983), which "requires the court to make a practical, common sense determination." <u>Moore</u>, 181 N.J. 40. Among other things, courts may consider an officer's "experience with specific forms of criminal activity" and observations of events, as well as a suspect's criminal record. <u>Id.</u> at 46; <u>Novembrino</u>, 105 N.J. at 126; <u>Jones</u>, 179 N.J. 3at 390-91.

"Information related by informants may constitute a basis for probable cause, provided that a substantial basis for crediting that information is presented." <u>Jones</u>, 179 N.J. at 389. "When examining an informant's tip to determine whether it establishes probable cause to issue a search warrant, the issuing court must consider the 'veracity and basis of knowledge' of the informant as part of its 'totality' analysis." <u>Ibid.</u> (quoting <u>Novembrino</u>, 105 N.J. at 123). "A deficiency in one of those factors 'may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some indicia of reliability.'" <u>Sullivan</u>, 169 N.J. at 212 (quoting <u>State v. Zutic</u>, 155 N.J. 103, 110-11 (1998)).

As to the first factor, veracity, past instances of reliability may be "probative of veracity," but their weight "in the ultimate determination of

probable cause may vary with the circumstances of each case." Id. at 213 (quoting State v. Smith, 155 N.J. 83, 94 (1998)). "[A] conclusory statement that the affidavit is 'based on information [the police] received from a confidential reliable informer' is not sufficient to establish the informant's veracity." Keyes, 184 N.J. at 555 (alteration in original) (quoting Zutic, 155 N.J. at 111).

Second, an informant's basis of knowledge is demonstrated when "the tip itself relates expressly or clearly how the informant knows of the criminal activity." Sullivan, 169 N.J. at 213 (quoting Smith, 155 N.J. at 94). However, "[i]n the absence of such explicit disclosure, 'the nature and details revealed in the tip may imply that the informant's knowledge of the alleged criminal activity is derived from a trustworthy source.'" Ibid. (quoting Smith, 155 N.J. at 94).

"Because the information contained in a tip is hearsay, police corroboration of that information 'is an essential part of the determination of probable cause.'" Ibid. (quoting Smith, 155 N.J. at 94). Police corroboration may bolster the veracity of an informant where the affidavit "inadequately documented" it. Id. at 213-14. "[I]f police corroborate 'information from which it can be inferred that the informant's tip was grounded on inside information, this corroboration is sufficient to satisfy the basis of knowledge prong' as well as the veracity prong." Id. at 214 (quoting Smith, 155 N.J. at 95-96).

Corroborating factors may include "controlled drug purchases performed on the basis of the informant's tip, the positive test results of narcotics obtained during a controlled purchase, and records corroborating an informant's account of the location of suspected drug activity." Jones, 179 N.J. at 390. An officer's experience in investigating a drug enterprise should also be considered, as well as a suspect's criminal history. Id. at 390-91.

The Jones Court emphasized the importance of a controlled buy. It clarified that although a controlled buy, without more, would not conclusively establish probable cause; it is still a significant factor. See Jones, 179 N.J. at 392. Instead, the Court reiterated "a controlled buy 'typically will be persuasive evidence in establishing probable cause.'" Ibid. (quoting Sullivan, 169 N.J. at 217). It further explained the test for probable cause was "qualitative[, ]not quantitative," and, "[t]hus, even one additional circumstance might suffice, in the totality of the circumstances, to demonstrate probable cause when the police successfully have performed a controlled drug buy." Ibid.

Here, defendant first argues the police lacked probable cause because the affidavits "relied on information obtained from [CIs], but neither provide reliability of the informants." He highlights the affidavit did not indicate how

27                                                                    A-3392-18

many times the informant was proven reliable or how the informant had proven truthful and reliable. We are unpersuaded.

In Keyes, the Court found the affidavit for a search warrant did "more than merely state that the tip came from a reliable confidential informant." 184 N.J. at 557. It based its finding that the affidavit was sufficient on the affidavit "stat[ing] that the informant ha[d] proven himself to be reliable by providing 'information in the past that ha[d] resulted in the arrest of numerous suspects and the recovery of proceeds from drug sales.'" Ibid. While the Court noted the affidavit could have provided a more detailed explanation, it still found, under the totality of the circumstances[7] in that case, the affidavit satisfied the veracity requirement. Ibid.

Donelson's affidavit for the first CDW stated he met with CRI-331, who "ha[d] provided information and cooperation to [the SCPO] in the past and ha[d] proven truthful and reliable." This statement is vague, and unlike the statement in Keyes, we do not know what the informant's information lead to, such as any

_____

[7] In Keyes, based on a CI's tip, the police conducted a controlled buy with the CI. Id. at 548-49. The suspected drugs field tested positive, defendant had a criminal record of four felony convictions, two of which involved drug offenses, and complaints were received by the police about drug activity on that street. Id. at 550, 559.

arrests or the seizure of any evidence, and thus, the veracity prong is not met by this statement alone.

Likewise, the "basis of knowledge" prong is not met, as Donelson's first affidavit stated only that CRI-331 told him defendant used a phone with a specific number to receive orders for cocaine purchases. This statement indicates some inside knowledge and previous dealings with defendant, as it is axiomatic a person would have some inside knowledge by knowing the person's phone number, but the information provided in the affidavit does not explain how CRI-331 knew defendant's phone number.

Nevertheless, the controlled buys, other corroboration, and Donelson's experience, established probable cause to support the CDW application, Donelson's belief that defendant was engaged in illegal conduct, and that the phone was being used by defendant to aid in the commission of CDS offenses. For example, the affidavit established, over several years, the police received information that defendant was engaged in trafficking narcotics. Additionally, in February 2015, the police conducted two controlled buys with CRI-331 and, in March used CRI-331 to attempt to introduce an undercover officer to defendant, but defendant would not deal with a person he did not know. Along

with the controlled buys, the affidavit also detailed Donelson's training and experience in drug investigations.

The second affidavit provided even more corroboration, including prior controlled buys with several additional CIs in 2014; defendant's criminal history which included nine convictions, some of which included drug charges; a detailed explanation of Donelson's experience and training, and the results of the first CDW, which included thousands of phone calls, hundreds of which were between defendant and known individuals with criminal records for drug offenses. Under these circumstances, there was probable cause to believe that a wiretap order and a renewal CDW would uncover evidence of defendant's involvement in the drug enterprise and reveal the other players involved.

We are not persuaded otherwise by defendant's other assertion on appeal that under N.J.R.E. 609, Donelson's affidavit impermissibly relied upon his remote criminal history. Defendant does not cite any binding authority that requires either the police or a reviewing court to only consider recent arrest history in either applying for a warrant or conducting a totality of the circumstances analysis for probable cause. And, many cases mention the defendant's criminal history as a factor to be considered, without limiting that history to only "recent" criminal history. See, e.g., Keyes, 184 N.J. at 557

(listing possible corroborating facts, including "the suspect's criminal history"). Thus, "the use of a prior criminal act [for purposes of obtaining a warrant] is subject to a less-stringent test than that applied to the admission of a prior conviction to impeach a defendant's credibility" under N.J.R.E. 609. Jones, 179 N.J. at 391.

Here, even applying the N.J.R.E. 609 ten-year test for remoteness, defendant's argument fails because the recent crimes that fall within the ten-year timeframe were relevant and sufficient to support the warrant. Per Donelson's affidavit, defendant was the subject of an investigation in 2007 and 2008, which resulted in the search of defendant's home and drugs were found, leading to his arrest and conviction. In January 2014, the police were informed again that defendant was selling narcotics. The CDW and wiretap warrant applications were filed in 2015. Thus, defendant's criminal history, in part, included recent convictions, which on their own were sufficient to support the warrant.

Defendant largely ignores some of his criminal history was recent and directly related to the criminal investigation for which the warrants and wiretap were sought. Instead, he relies upon State v. Christy, 112 N.J. Super. 48 (Law Div. 1970), which does not support his argument, even if it was binding authority. The language of that case does not mandate that only recent arrests

or convictions can be considered. There the trial court stated prior arrests, "as distinguished from actual convictions," standing alone would not be sufficient to support a warrant for seemingly innocent behavior. Id. at 70. However, "a past history of recent arrests for offenses similar to the one believed to be currently occurring" could have some "bearing upon the quest for probable cause," and, therefore, "the issuing judge was entitled to give some weight" to recent arrests in those circumstances. Id. at 70. Here, defendant was convicted in 2008 for drug offenses, that conviction would not fall beyond the ambit of Rule 609, if it even applied, and is highly relevant to the determination of probable cause as suggested by Christy, because it relates to the activity defendant was suspected of engaging in shortly after his release from prison. Also, Christy carefully distinguished mere arrests from convictions, which are more relevant to that determination. Ultimately, there was no reason for Donelson to not include defendant's complete criminal history or for the issuing court to disregard his earlier crimes.

Under these circumstances, we are convinced the trial court correctly decided that the CDWs and wiretap order were properly issued.

A-3392-18

IV.

Last, we consider defendant's challenge to his sentence. Relying on State v. Case, 220 N.J. 49 (2014), defendant argues his sentence is excessive because the trial court did not give any reasoning for finding aggravating factor nine applied and carried significant weight. We find no merit to this contention.

A.

Prior to sentencing defendant, the trial court reviewed his criminal history, which included the following previous convictions: distribution of CDS and hindering (1995); unlawful possession of a handgun, robbery, and resisting arrest (1996); possession of CDS within a school zone (1998); distribution of CDS (2000); and "twice possession with intent and also a possession of CDS" (2008). The court found the terms of the negotiated plea agreement were appropriate and sentenced defendant in accordance with the agreement.

As relevant to the issues on appeal, when the court discussed the aggravating factors it stated the following:

> I find aggravating factor six, the extent of the defendant's prior criminal record and the nature of any of those convictions. His criminal history is as I have just noted. And I give factor six significant weight.
>
> And I find aggravating factor nine, the need to deter this defendant and others from violating the law.

This factor applies in all cases and in this case I find it to be entitled to significant weight.

Looking at the statutory mitigating factors I find that none of them are applicable to this particular case.

B.

We "review of a sentencing court's imposition of sentence [under] an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). We will "not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). Instead, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case make the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"A sentence imposed pursuant to a plea agreement is presumed to be reasonable because a defendant voluntarily '[waived] . . . his rights to a trial in return for the reduction or dismissal of certain charges, recommendations as to sentence and the like.'" Id. at 70-71 (alteration and omission in original) (quoting State v. Davis, 175 N.J. Super. 130, 140 (App. Div. 1990)).

A-3392-18

Nonetheless, a sentence recommended as part of a plea bargain may be "vacated if it does not comport with the sentencing provisions of our Code of Criminal Justice." Id. at 71. "[T]he Code, our case law and the court rules prescribe a careful and deliberate analysis before a sentence is imposed." Ibid. (alteration in original). A "general" statutory framework guides "'judicial discretion . . .' to ensure that similarly situated defendants [do] not receive dissimilar sentences." Id. at 72 (alteration in original) (quoting State v. Natale, 184 N.J. 458, 485 (2005)). "When the trial court fails to provide a qualitative analysis of the relevant sentencing factors on the record, [we] may remand for resentencing." Id. at 70.

A qualitative analysis requires consideration of the sentencing factors under N.J.S.A. 2C:44-1. Id. at 72. First, the sentencing judge must identify whether any aggravating factors under N.J.S.A. 2C:44-1(a) apply, and whether any mitigating factors under N.J.S.A. 2C:44-1(b) apply. Ibid. "Each factor found by the trial court to be relevant must be supported by 'competent, reasonably credible evidence.'" Ibid. (quoting Roth, 95 N.J. at 363). Then, the court must balance the aggravating and mitigating factors, the judge "does more than quantitatively compare the number of pertinent aggravating factors with the number of applicable mitigating factors; the relevant factors are qualitatively

assessed and assigned appropriate weight in a case-specific balancing process." Id. at 72-73.

Importantly, "[a]t the time of sentencing, the court must 'state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting sentence.'" Id. at 73 (omission in original) (quoting R. 3:21-4(g)). "A careful statement of reasons" should address the factors at issue to demonstrate both to defendants and the public that all arguments have been evaluated and to "facilitate[] appellate review." Id. at 73-74. Indeed, "a trial court should explain its analysis of N.J.S.A. 2C:44-1's aggravating and mitigating factors with care and precision," to "avoid disparity in sentencing as the Legislature intended, to facilitate fair and effective appellate review, and to ensure that the defendant, the State and the public understand the reasons for the sentence." Id. at 81.

As the Fuentes Court explained, aggravating factor nine "invokes '[t]he need for deterring the defendant and others from violating the law.'" Id. at 78 (alteration in original) (quoting N.J.S.A. 2C:44-1(a)(9)). On this factor, the court's determination must be "a 'qualitative assessment' of the risk of recidivism," and the decision must "involve[] determinations that go beyond the simple finding of a criminal history," as well as "include an evaluation and

judgment about the individual in light of his or her history." Ibid. (quoting State v. Thomas, 188 N.J. 137, 153 (2006)).

In Fuentes, when sentencing the defendant, the court originally only found one aggravating factor, number nine, and "assigned it 'substantial weight.'" Id. at 67. Later it held another sentencing hearing and added factor one. Ibid. The Court reversed, finding, among other things, that the trial court's reasons for applying factor nine were "insufficiently explained" and the application of the factor was "not supported by competent and credible evidence in the record." Id. at 80-81. The Court noted, in sentencing Fuentes, the trial court acknowledged he had no criminal history and found mitigating factor eight (the offense was "the result of circumstances unlikely to recur," N.J.S.A. 2C:44-1(b)(8)) applied, which further "complicated" its finding of aggravating factor nine. Id. at 67, 79. On remand, the Court instructed the trial court to address both specific and general deterrence and explain "in greater detail its assessment of the weight assigned to each aggravating and mitigating factor, and its balancing of those statutory factors as they apply to [the] defendant." Id. at 81.

In Case, at the defendant's sentencing, the court "placed 'particular emphasis on aggravating factor nine' because 'adult predators of young girls must be deterred' and because the 'need to deter this particular defendant and

others from these types of crimes is substantial.'" 220 N.J. at 61. The defendant presented nine mitigating factors as well, and the court only addressed three of those. Id. at 69.

On appeal, our Supreme Court vacated the defendant's sentence because of several issues with weighing the mitigating and aggravating factors, including the sentencing court did not "sufficiently explain[ing]" why it placed "particular emphasis" on factor nine. Id. at 68. The Court agreed with the sentencing court that adult predators had to be deterred, but also recognized "general deterrence unrelated to specific deterrence has relatively insignificant penal value." Ibid. Additionally, the Court highlighted the record showed the defendant was a first-time offender who suffered from Post-Traumatic Stress Disorder and depression, in the years between his arrest and trial, he underwent psychological therapy, and during that time remained law-abiding and helped to support his family. Ibid. It also noted the defendant would be on parole supervision for life and subject to random searches of his computer. Ibid. The Court "did not suggest that aggravating factor nine [could not] be credited here," but reiterated "the issue is how much weight should be given to that factor." Ibid.

In contrast, in State v. Pillot, where the defendant pled guilty to charges associated with several armed robberies she had committed, the trial court found

at her sentencing: "[u]nder [N.J.S.A.] 2C:44-1, aggravating circumstances, [s]ections 1, 3, 6, and 9. Mitigating circumstances, none." 115 N.J. 558, 563 (1989) (first and second alterations in original). The Court upheld the sentence, reasoning the court's statement of reasons could have been clearer, but it was "possible in the context of this record to extrapolate without great difficulty the court's reasoning." Id. at 566. It also noted that the sentence was within the discretionary parameters of the Code and that it was imposed pursuant to a guilty plea and was presumed reasonable. Ibid.

Here, the trial court did not provide an explanation as to why it assigned factor nine significant weight. However, unlike the circumstances in Fuentes and Case, the record here is clear as to why the need to deter defendant was granted significant weight. The Fuentes and Case Courts both reversed where there was an insufficient explanation, and the record did not support the imposition of applying aggravating factor nine or assigning it significant weight. That same issue is not present here.

Defendant had nine prior felony convictions, the most recent of which for distribution of CDS. Defendant also did not present any mitigating evidence, unlike the defendant in Case, who was a first-time offender and had gone through therapy. As this sentence was within the parameters of the Code, it did

39

not "shock the judicial conscience," see Pillot, 115 N.J. at 566, and the sentence imposed was presumed reasonable, as it conformed to the plea bargain. See ibid. There is no reason to remand for resentencing here, where there is clear evidence supporting the application of aggravating factor nine in the record, even if the trial court did not delve into reasons for applying that factor.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3392-18