**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3808-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RODNEY E. WILLIAMS,

     Defendant-Appellant.

_____

Submitted on October 10, 2023 – Decided December 19, 2023

Before Judges Gilson and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 20-02-0200.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Patrick Ryan McAvaddy, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Rodney E. Williams appeals from his guilty plea conviction for second-degree unlawful possession of a handgun. He contends the trial court erred in denying his motion to suppress the handgun seized by the police during an investigative detention. After reviewing the record in light of the governing law, we reverse and remand this matter for further proceedings.

I.

By indictment, defendant was charged with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b(1) (count one); second-degree certain persons, N.J.S.A. 2C:39-7b(1) (count two); fourth-degree unlawful possession of hollow point bullets, N.J.S.A. 2C:39-3f(1) (count three); and third-degree receiving stolen property, N.J.S.A. 2C:20-7a (count four).

Defendant moved to suppress the handgun and an evidentiary hearing was held on November 10, 2021. On January 14, 2022, the trial judge issued an order accompanied by a written decision denying defendant's motion to suppress. The trial judge determined there was reasonable suspicion for the stop and frisk of defendant. First, the trial judge found there was reasonable suspicion to stop and frisk defendant based on the description provided by a tip from the confidential informant (C.I.) and the "basis of knowledge" obtained by an officer viewing CCTV footage. The judge further found that "[d]ue to

2

the nature of the offense, there was reasonable suspicion to warrant the frisk for protection of the officer." Therefore, "[u]nder the totality of circumstances, both the stop and pat[-]down of [d]efendant were valid."

Second, the trial court determined there was reasonable cause to detain defendant after the investigative stop and pat-down. The court explained, "[w]hile the resulting search [of defendant] did not produce weapons or contraband, there was reasonable suspicion to continue to detain [d]efendant due to the CI tip, confirmation of [d]efendant's presence in the relevant location, in a high crime area, and the behavior of [c]o-defendant." The judge concluded, "[c]onsidering the totality of the circumstances, the facts . . . support[ed] a finding of reasonable and articulable suspicion."

Following the denial of his motion to suppress, defendant pleaded guilty to second-degree unlawful possession of a handgun and reserved the right to appeal.

We recite the salient facts elicited at the suppression hearing. The State presented two witnesses: Jersey City Police Department Sergeant Joemy Fernandez, then a police officer, and Sergeant Jason Perez.

On September 11, 2019, Fernandez and his partner, Mohamed Saheed, were assigned to the street crimes unit. At about 8:30 p.m., the officers

received a notification from Lieutenant Mohammad Riaz "that he received information from a registered and reliable confidential informant (C.I.) that [] a male [was] in the area of Neptune and Ocean Avenue[s] wearing a multi-colored sweatsuit was in possession of a handgun." Fernandez explained the C.I. was registered because he was "known to [Riaz]," had been "used in the past," and had been "proven reliable." According to Fernandez, the area of Neptune and Ocean Avenue is a "high crime area" "prone to gun violence, gang violence, drugs, shootings, [and] robberies." On cross-examination, Fernandez testified that he was notified that a "black male" was in possession of the handgun. No other identifiers were provided.

Officer Macaluso, also working the night shift, was monitoring CCTV footage. Based on Macaluso's observations, officers were informed that a male matching the C.I.'s description was "leaving the area" and entering 116 Neptune Avenue. Fernandez responded to the area to "canvas" for the male. While traveling west on Neptune, Fernandez observed a male, wearing a multi-colored sweatsuit, and a female, wearing a black tank top and camouflage pants, leaving 116 Neptune Avenue. The male was later identified as defendant and the female was later identified as Alfreda Williams, although testimony was not provided as to how they were identified. Fernandez saw

4                                                                    A-3808-21

defendant hold the door for Alfreda while engaged in a conversation with her. They walked east on Neptune. As they were walking east, the officers exited the patrol car. Fernandez stopped defendant. Alfreda began walking away toward what appeared to be an alleyway, then quickly changed direction walking east on Neptune. She yelled out: "I'm not with him. I'm not with him," and continued to walk away.

Saheed then conducted a pat-down of defendant. No weapons or contraband was found on defendant. Yet, the officers continued to detain defendant for a "short period, about a minute," because Fernandez found Alfreda's behavior to be "suspicious". He explained, Alfreda had not shown "concern" for defendant. She also "quickly" walked in one direction away from defendant, "darted out" and walked in a different direction. Fernandez then explained he "continued to detain defendant for 'a short period of time', [about four minutes], following the pat-down until Alfreda could be located because of her reaction when police arrived." Fernandez stated it was approximately "a minute" to "a minute and a half" between the time he stopped defendant and when he received the radio call from Perez that Alfreda had been stopped.

5

Perez arrived fifteen to thirty seconds after Alfreda walked away from the officers and defendant. He testified that his assistance was requested in a firearm investigation based on the radio call from Riaz. Defendant had already been stopped by Fernandez and Saheed when he arrived. Fernandez described Alfreda to Perez and told him that she had been with defendant and had walked off toward Ocean Avenue.

Perez drove toward Ocean Avenue to locate Alfreda for further investigation. Initially, he traveled south on Ocean Avenue, where he saw a group of females, but none matched Fernandez's description. Perez then turned around and headed north on Ocean Avenue.

Eventually, Perez found Alfreda walking west on Bartholdi Avenue. Alfreda was walking with a "young juvenile Hispanic male, wearing a camouflage tank top and camouflage shorts, and a blue drawstring bag on his back." Perez described the bag as a "thin nylon bag" with "thin strings" worn around a person's shoulders, commonly used to carry "like a basketball."

Perez was about one car length away from Alfreda and juvenile when he saw them in an area lit by streetlights. As Perez approached, he noticed the juvenile's "bag was extremely weighted down by an object, and…there was…a

6

90-degree outline that appeared to be a handgun." Perez believed the object was a handgun based on its outline and his training and experience.

So, Alfreda and the juvenile were stopped and frisked. During the pat-down of the outside of the juvenile's bag, Perez determined the object was metal and immediately recognized it as a handgun. The juvenile was placed under arrest. Perez did not search inside the bag. Eventually, Perez recovered a 9-millimeter Hi-Point handgun from the bag and placed it in his vehicle for safekeeping before it was transported for processing.

After Perez arrested the juvenile, Alfreda spontaneously stated, "No, it's not his. It's–I gave it to him. It's my boyfriend's gun" or "The male that you have stopped's (sic) gun." Perez made a radio call to Fernandez and advised that he located the handgun and that Alfreda said defendant had given her the gun.

Fernandez placed defendant under arrest and transported him to Perez's location. Fernandez confirmed Alfreda's identity. Alfreda spontaneously restated that the gun was not the juvenile's and it belonged to defendant, who had given it to her to hold. Alfreda further stated that she had held the gun "in her bra or shirt and that she placed it in a bag."

II.

7

Defendant raises one issue on appeal. He contends the court erred in denying the suppression motion because he was unlawfully detained after the pat-down did not produce weapons or contraband. We agree.

The standard of our review on a motion to suppress is deferential. State v. Nyema, 249 N.J. 509, 526 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We "defer[] to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Nyema, 249 N.J. at 526 (quoting Elders, 192 N.J. at 244). Generally, we do not disturb the trial court's factual findings unless they are "clearly mistaken" and must be reversed in the interests of justice. State v. Cohen, 254 N.J. 308, 319 (2023) (internal citations omitted). In contrast to the deference owed to a trial court's factual and credibility findings, we review a trial court's legal conclusions de novo. State v. S.S., 229 N.J. 360, 380 (2017).

The Fourth Amendment to the United States Constitution and Art. I § 7 of the New Jersey Constitution protect the right of individuals from

A-3808-21

unreasonable searches and seizures. State v. Smart, 253 N.J. 156, 164 (2023) (quoting Nyema, 249 N.J. at 527). "Warrantless seizures are presumptively invalid as contrary to the United States and the New Jersey Constitutions." State v. Pineiro, 181 N.J. 13, 19 (2004). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)). Here, the Stated failed to meet its burden of proof.

Critical to our inquiry is the nature and scope of the officers' initial encounter with defendant and the subsequent detention. Under the federal and New Jersey constitutions, the police may stop and frisk a person if they have reasonable suspicion that evidence of criminal activity or a weapon may be found on that person. Terry v. Ohio, 392 U.S. 1, 26-27 (1968); State v. Smith, 155 N.J. 83, 91-92 (1998). The standard of reasonable suspicion is less rigorous than probable cause to warrant an arrest. Terry, 392 U.S. at 26-27; State v. Shaw, 213 N.J. 398, 410 (2012). "However, an officer's hunch or subjective good faith—even if correct in the end—cannot justify an investigatory stop or detention." Id. at 411.

The Terry stop, or an investigative stop, "involves a relatively brief detention by police during which a person's movement is restricted." State v. Goldsmith, 251 N.J. 385, 399 (2022); see also State v. Rosario, 229 N.J. 263, 272 (2017). An investigative stop or detention "is permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" State v. Rodriquez, 172 N.J. 117, 126 (2002).

During an investigative stop, a police officer may conduct a protective search or pat-down without a warrant when the officer believes the individual detained is armed and dangerous. Terry, 392 U.S. at 27; see also State v. Thomas, 110 N.J. 673, 678 (1988). An officer is permitted "'to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" State v. Roach, 172 N.J. 19, 27 (2002) (quoting Terry, 392 U.S. at 23). In other words, an officer may "conduct 'a carefully limited search of the outer clothing'" to determine whether weapons are present. Id. (quoting Terry, 392 U.S. at 30). Like an investigatory stop, "to conduct a protective search, an officer must have a 'specific and particularized basis for an objectively reasonable suspicion that defendant was armed and dangerous.'" Ibid. (italicization omitted).

"Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of 'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" Goldsmith, 251 N.J. at 399 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)). The inquiry "takes into consideration numerous factors, including officer experience and knowledge." Id. at 400.

Applying these principles, we conclude the trial judge erred in finding the officers had a reasonable suspicion that defendant had a handgun to justify the stop and, in turn, the frisk.

We view the reliability of the tip from a C.I. under a totality of circumstances test. An informant's tip, though hearsay, may be considered "'so long as a substantial basis for crediting [it] is presented.'" Smith, 155 N.J. at 92 (quoting State v. Novembrino, 105 N.J. 95, 111 (1987)). Two factors which are "essential" in establishing the credibility of an informant's tip are the "informant's 'veracity' and . . . 'basis of knowledge.'" Id. at 93 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Veracity is established by "demonstrating that the informant proved to be reliable in previous police

A-3808-21

investigations." State v. Sullivan, 169 N.J. 204, 213 (2001). An informant's basis of knowledge is demonstrated when "the tip itself relates expressly or clearly how the informant knows of the criminal activity." Ibid. (internal citation omitted).

Here, the judge determined the officers had reasonable suspicion to detain defendant based on the tip from the C.I. As to the C.I.'s veracity, Fernandez made a generalized statement that the C.I. had "proven reliable" because he was "known to Riaz" and nothing more. Absent from the record is any testimony regarding the length of the C.I.'s relationship with Riaz or if the prior tips were fruitful.

Regarding the C.I.'s "basis of knowledge," all that was relayed by the C.I. to Riaz was that the suspect was "male" wearing a "multi-colored sweatsuit." The tip was silent to any other detailed identifiers. This information alone "[did] not show that the [C.I.] had knowledge of concealed criminal activity." Rosario, 229 N.J. at 276 (internal citation omitted). Additionally, the record is silent as to how the C.I. came into possession of the information that defendant possessed a handgun. "Without knowing the facts that led the informant to believe defendant was engaged in illegal activity, we

cannot make an independent determination of whether that conclusion was reasonable." Smith, 155 N.J. at 98.

The sex and clothing identifiers, even if corroborated by Macaluso's observation, were not indicative of criminal activity. We hold that neither the C.I. tip nor Macaluso's observation was a "reliable source of information" to satisfy the basis of knowledge factor. Smith, 155 N.J. at 97. These facts, individually or cumulatively, were insufficient to establish an objectively reasonable suspicion that defendant possessed a handgun. See Thomas, 110 N.J. at 683.

We similarly conclude the trial judge erred in finding the officers had reasonable and articulable suspicion to detain defendant based on his presence in the high crime area and Alfreda's behavior. Though the trial judge may consider defendant was within the "high crime area" of Neptune and Ocean Avenues, our Supreme Court "has held that '[j]ust because a location to which police officers are dispatched is a high-crime area does not mean that the residents in that area have lesser constitutional protection from random stops.'" Goldsmith, 251 N.J. at 399 (quoting Chisum, 236 N.J. at 549; see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000)) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a

13

reasonable, particularized suspicion that the person is committing a crime."); Pineiro, 181 N.J. at 31 (Albin, J., concurring) ("The words 'high crime area' should not be invoked talismanically by police officers to justify a Terry stop that would not pass constitutional muster in any other location."). Although "officers need not ignore the relevant characteristics of a neighborhood, . . . more is required to find reasonable suspicion." Goldsmith, 251 N.J. at 400-401 (citing Wardlow, 528 U.S. at 124). Furthermore, Fernandez's experience that Alfreda's behavior was suspicious, and Perez's "hunch" the juvenile's drawstring bag contained a gun, which proved correct, did not justify defendant's on-going detention. Shaw, 213 N.J. 411.

When the officers did not find the handgun on defendant, he should have been immediately free to leave. The intervening search for Alfreda, discovery of the handgun, and Alfreda's spontaneous utterances do not "purge[] the taint" from the eventually-discovered handgun. Shaw, 213 N.J. at 421; Smith, 155 N.J. at 101. Defendant's arrest based on possession of the handgun stemmed from the unlawful detention. Accordingly, the evidence must be suppressed.

We reverse the trial judge's denial of defendant's motion to suppress evidence. We vacate that plea because of the likelihood defendant would not

14

have pleaded guilty if he knew the evidence seized was suppressed.  Therefore,

we  remand this matter for further proceedings consistent with this opinion.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION