**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0450-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAZMERE HOPPS,

     Defendant-Appellant.

_____

Argued December 12, 2023 – Decided February 9, 2024

Before Judges Haas and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-11-3048.

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel and on the briefs).

Rachel Maureen Lamb, Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Kevin Jay Hein, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress, defendant Jazmere Hopps pled guilty to second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1), and was sentenced to a three-year custodial term with a one-year period of parole ineligibility. He appeals the court's decision denying his suppression application, raising the following issues for our consideration:

> THE POLICE ACTIONS IN THIS CASE WERE BASED ON A TIP FROM A CONFIDENTIAL INFORMANT WHOSE RELIABILITY, VERACITY, AND BASIS OF KNOWLEDGE WERE INSUFFICIENTLY DEMONSTRATED, AND THE TIP WAS INADEQUATELY CORROBORATED. THE EVIDENCE FOUND MUST BE SUPPRESSED.
>
> A. The police unlawfully stopped the car.
>
> B. The police unlawfully ordered the men out of the car and frisked them.

Because we conclude the court erred in determining there was reasonable suspicion to stop the vehicle in which defendant was a passenger, we reverse and remand for further proceedings.

## I.

The events leading to defendant's arrest were described in detail at the suppression hearing at which Camden County Police Department (CCPD) Detective Krispin Jackson testified. Det. Jackson explained he and his partner were sent to patrol the Parkside neighborhood in south Camden on September

15, 2021, during the daytime shift in response to a tip he received from a confidential informant (CI) about a possible retaliatory shooting related to an ongoing feud between individuals in the McGuire Gardens and Parkside neighborhoods. As detailed further, infra, Det. Jackson never testified specifically as to when the tip was received, and his two written reports indicated police were in the area in response to unspecified "recent violence and shootings."

The CI identified the shooter as a man called "Nunu," who Det. Jackson testified was later identified as co-defendant Ronald H. Brown. Det. Jackson characterized the CI as "very reliable," and noted his information had led to five to ten arrests in the past. One of Det. Jackson's written reports specified the information "resulted in multiple firearm arrests." Det. Jackson added another detective had received the same information from a different CI, who he learned "had been reliable" on "previous occasions." The court later found the testimony regarding the second CI not credible and did not consider it, in part, because none of the reports ever mentioned the existence of the second CI.

After receiving the tip, Det. Jackson explained he engaged CCPD's Strategic Analysis Unit (SAU) Analyst Daniel Bogas to determine "Nunu's" identity and "known associates." Although the investigation revealed Brown

A-0450-22

had never been charged with a firearms offense, Det. Jackson did not testify if defendant had a criminal record.

Det. Jackson stated he and Analyst Bogas utilized public and law enforcement databases as well as social media to gather additional information, which led Analyst Bogas and other SAU members to discover a live video broadcast on the social media application Instagram by Jaylin Pierson,[1] one of "Nunu's" purported "associates." Det. Jackson acknowledged he did not observe the video directly. Instead, Analyst Bogas conveyed to him by radio what the video detailed in real time. Because the live broadcast was only seconds long, and the police had not been prepared to record it, Det. Jackson stated CCPD did not save the video or take a screenshot.

Det. Jackson described the Instagram Live video as depicting five men inside a car, four of whom he and Analyst Bogas identified as defendant, Pierson, Brown, and co-defendant Rahkease Seawright. According to Det. Jackson, "Jaylin Pierson commented on … [the] … video saying, 'we're on the 1100 block . . . [and] if they try to stop us, we're not going to stop,'" which he understood to mean the car would not stop if police attempted to pull it over.

---

[1]  At times, Pierson's name is spelled "Pearson" in the record. We utilize the spelling provided in the police reports and the court's orders.

A-0450-22

Approximately thirty minutes after learning about the Instagram Live video, Det. Jackson testified he saw a red Hyundai stopped across the intersection of Empire Avenue and Park Boulevard. Through the windshield of the Hyundai, he stated he saw and recognized the five men from the Instagram Live video based on pictures to him sent by SAU.[2] Det. Jackson testified he also recognized Seawright from past arrests involving illegal firearms. Det. Jackson then began to follow the red Hyundai in his unmarked car and requested a marked patrol car conduct a traffic stop.

Other CCPD officers stopped the red Hyundai near the intersection of Haddon Avenue and Liberty Street, an area which Det. Jackson described as "known for a multitude of crimes, violent crimes, [and] CDS[controlled dangerous substance]-related crimes." After searching the car, the driver, co-defendant Tyron W. Lee, and each of the passengers, the police seized two firearms—one from defendant and the second from the vehicle.

Det. Jackson confirmed he wrote two reports, dated September 19, 2021 and March 9, 2022, neither of which stated when the CI's tip was received, or

---

[2] Because Det. Jackson admitted he did not directly observe the Instagram Live video and CCPD was not able to capture screenshots from it, it is unclear how Det. Jackson recognized the men from the video or which pictures SAU sent to him.

A-0450-22

that two CIs were involved. He also admitted the tip advised simply that "Nunu" would be in the Parkside neighborhood, which is where Brown lived. It did not state: "Nunu" was armed, what clothes he was wearing, how he was traveling, or the make or model of any vehicle involved. Further, Det. Jackson stated when he saw the red Hyundai, it was heading in the opposite direction of McGuire Gardens. He also confirmed neither CI mentioned defendant, that he would be with "Nunu," or that he was armed, or in any way involved in any prior shooting.

A Camden County grand jury returned an indictment charging defendant with: second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d); second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1); third-degree possession of parts to manufacture a firearm without a serial number, N.J.S.A. 2C:39-9(k); and third-degree possession of a manufactured firearm without a serial number, N.J.S.A. 2C:39-9(n).

Defendant moved to suppress, arguing the police did not possess sufficient grounds to stop the car. After the State filed its opposition and defendant his reply, the State filed a supplemental brief and disclosed for the first time Det. Jackson's March 2022 report. That report provided new details about Det.

6

Jackson's observation of the car turning without properly signaling[3] and the CI's tip. According to this second report, the CI specifically identified Brown as "Nunu" and stated he and an individual called "Sav," identified as Rayquan Newman, "were shooting at each other." Det. Jackson indicated the CI informed him "Brown would be in the Parkside area of Camden city" but also that "Brown was going to McGuire Gardens or . . . the 'McGuire boys' were coming to Parkside to 'shoot it up.'" The report further stated CCPD had been conducting "undercover surveillance" in Parkside "due to the recent violence, and shootings," but did not point to any particular, specific event giving rise to "Nunu's" purported motive to retaliate.

The court granted an adjournment of the suppression hearing over defendant's objection to permit Det. Jackson to testify. At the close of the hearing, defendant argued there was insufficient information to justify the stop because the State had not demonstrated that the tip was reliable, nor that it was adequately corroborated. Specifically, he claimed Det. Jackson's "simple conclusory statement" was not enough to show the CI's reliability, the Instagram

_____

[3] The State did not rely on this alleged traffic violation to justify the stop in the court or before us and the court made no factual findings regarding the purported motor vehicle infraction. We accordingly do not consider that purported violation as part of our Fourth Amendment analysis.

7

Live video did not corroborate anything regarding the tip, the car was driving away from McGuire Gardens contrary to the CI's statement, nothing in the tip "was about anyone other than 'Nunu' who was later identified as . . . Brown," and Det. Jackson's claim that a second CI had given consistent information was not credible because it was "never put in his report[s]" and was "newly added in testimony today."

In response, the State argued there was sufficient information to stop the car because the basis for the tip could "be inferred by the details that the CI was given" and the CI's tip was "corroborated independently by the other CI's information." Additionally, it asserted the court should credit Det. Jackson's testimony about the second CI because his previous omission of same in his reports was based on his attempt to protect the CIs' identities.

The court questioned why Det. Jackson felt "comfortable enough to identify one CI, and then in his second report call him confidential informant, but somehow not feel like it was a good idea to use the fact that he had a second one." The prosecutor responded she would "attribute that to him obviously just giving lack of information," but noted the second CI's similar tip could be independently corroborated by another witness. The prosecutor then requested

8

to reopen and adjourn the hearing to call that witness, to which defendant and Brown objected. The court declined to reopen or adjourn the matter.

The court issued an order denying defendant's application and explained its decision in a written opinion. It found Det. Jackson's testimony about the first CI's reliability credible, but the testimony about the second CI limited in trustworthiness because the second CI was "not previously included in the prior [police] reports" and the testimony was "layered in hearsay."

In finding a sufficient basis to stop the car, the court explained "[a]n investigatory stop is justified when the police have particularized suspicion," under State v. Chisum, 236 N.J. 530, 545 (2019). Relying upon State v. Coles, 218 N.J. 322, 343 (2014), the court noted particularized suspicion requires "articulable facts," more than "arbitrary police practices, the officer's subjective good faith, or a mere hunch," but reliable and corroborated information from a CI can provide the basis for an investigatory stop under State v. Smith, 155 N.J. 83, 92 (1998).

To determine a CI's reliability, the court continued, it looks to the totality of the circumstances, particularly the CI's "veracity" and "basis of knowledge," under Smith, 155 N.J. at 93. Relying on State v. Zutic, 155 N.J. 103, 110-11 (1998), the court explained a "strong showing" on one factor, or "other indicia

of reliability" can outweigh a shortcoming in either factor. As to veracity, the court noted "past instances of reliability are probative," but not conclusive, and their weight may vary in the overall calculus under Smith, 155 N.J. at 94. The court next explained the CI's basis of knowledge may be discerned from details and the nature of the tip itself, ibid., but independent corroboration by police is necessary and essential under State v. Jones, 179 N.J. 377, 390 (2004). It also cited State v. Rodriguez, 172 N.J. 117, 127-28 (2002) for the proposition the level of corroboration required depends on the totality of circumstances.

The court found the CI was reliable, based on Det. Jackson's testimony the CI had provided information leading to arrests in the past, and the tip was adequately detailed. Specifically, the court noted the tip included "the name of the suspect, the means and nature of the crime, the location of the crime, and the motive for the crime." The court also found CCPD corroborated the tip by determining the identity of "Nunu," finding Brown's "known associates," and observing the Instagram Live video with Pierson's comments. Based on the totality of the circumstances the court concluded the CI's tip demonstrated "a reasonable and articulable suspicion that defendant Brown would be involved in a retaliatory shooting" and because Brown was a passenger in the car, "Det[.] Jackson had a constitutional basis to initiate a motor vehicle stop."

10

Defendant moved for reconsideration, arguing the new facts alleged in Det. Jackson's supplemental report and testimony at the suppression hearing were "plainly not credible" and should not have been considered. In any event, he contended the totality of circumstances did not support the stop because the CI's tip lacked veracity or a sufficient basis of knowledge.

In opposing reconsideration, the State primarily relied upon its prior arguments. It argued the tip was adequately corroborated by the Instagram Live video and Det. Jackson's observations which, combined with the CI's history of tips leading to arrests in the past, overcame any deficiency in the CI's basis of knowledge.

The court declined to reconsider its ruling, finding its decision was not "based upon a palpably incorrect or irrational basis" nor did it fail to "consider, or . . . to appreciate the significance of probative, competent evidence," under State v. Puryear, 441 N.J. Super. 280, 294 (App. Div. 2015). The court acknowledged the tip provided was not as detailed as those in State v. Keyes, 184 N.J. 541 (2005), Smith, 155 N.J. at 92, or other cases relied upon by defendant, but noted the basis of knowledge required to establish reasonable suspicion was less than that necessary to show the probable cause required in those cases.

A-0450-22

The court again rejected defendant's claim the tip was not properly corroborated. It found Det. Jackson credibly testified he "utilized law enforcement sources" including "public and law enforcement data bases" to "'put the alias ["Nunu"] with the name and identification' of defendant Brown" (alteration in original) and to identify the co[-]defendants as "Nunu's" "associates." Finally, the court noted the tip, combined with the Instagram Live video, Det. Jackson's observation of Brown in a vehicle, and the location of that vehicle, gave police reasonable suspicion that, at a minimum, "the occupants of the vehicle unlawfully possessed a firearm."

Defendant pled guilty to second-degree possession of a handgun without a permit in exchange for dismissal of the remaining counts against him and an unrelated indictment. The State also agreed to a Graves Act waiver and to recommend a downward departure in the sentencing range to that of a third-degree offense. As noted, the court sentenced defendant to a three-year custodial sentence with one year of parole ineligibility. This appeal followed.

II.

Defendant contends the court erred in denying his suppression motion because the police lacked (1) reasonable suspicion to stop the car in which he was a passenger, (2) a basis for heightened caution to justify removing him from

12

the car, and (3) a particularized, reasonable suspicion that he was armed and dangerous to permit frisking him. We agree the record does not establish the police had reasonable suspicion to stop the Hyundai, mandating suppression of the subsequent warrantless seizure. See Wong Sun v. United States, 371 U.S. 471 (1963). As such, we deem it unnecessary to address the underlying facts and the constitutional propriety of the police officers' subsequent removal of defendant from the car and his frisk.

The "standard of review on a motion to suppress is deferential." State v. Nyema, 249 N.J. 509, 526 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We "defer[] to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Nyema, 249 N.J. at 526 (quoting Elders, 192 N.J. at 244). We review "[a] trial court's legal conclusions . . . and its view of 'the consequences that flow from established facts,' . . . de novo." Id. at 526-27 (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

Turning to the substantive legal principles, warrantless searches and seizures "are presumptively invalid as contrary to the United States and the New Jersey Constitutions." State v. Pineiro, 181 N.J. 13, 19 (2004). If a search or seizure is conducted without a warrant, "the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement." State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (quoting Chisum, 236 N.J. at 546).

One such exception is an investigatory stop, which must be "'justified at its inception' by a reasonable and articulable suspicion of criminal activity." State v. Rosario, 229 N.J. 263, 276 (2017) (quoting State v. Dickey, 152 N.J. 468, 476 (1998)). A suspicion of criminal activity is reasonable only if it is based on "some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity." Pineiro, 181 N.J. at 22 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The reasonable suspicion standard is "less demanding" than that of probable cause. Nyema, 249 N.J. at 527.

In determining whether the police had reasonable suspicion, a court must consider the "totality of the circumstances." Ibid. The inquiry "takes into

consideration numerous factors, including officer experience and knowledge." State v. Goldsmith, 251 N.J. 394, 400 (2022).

"An informant's tip is a factor to be considered when evaluating whether an investigatory stop is justified." State v. Golotta, 178 N.J. 205, 213 (2003). The reliability of a CI's tip is also analyzed under "the totality of the circumstances." Zutic, 155 N.J. at 110. "An informant's 'veracity' and 'basis of knowledge' are two highly relevant factors under the totality of the circumstances." Ibid. (quoting Smith, 155 N.J. at 93). "A deficiency in one of those factors 'may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'" Id. at 110-11 (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)).

An informant's veracity may be established by "past instances of reliability." Smith, 155 N.J. at 93. The Court has cautioned, however, "[a] few past instances of reliability do not conclusively establish an informant's reliability." Id. at 93-94. "Similarly, a statement that the police believe the informant is reliable because [they] 'did a job for [an officer] in the past,' without additional information, will not firmly establish veracity." Keyes, 184 N.J. at 555 (second alteration in original) (quoting Smith, 155 N.J. at 96-97).

15

Further, the basis of an informant's knowledge may be established when "the tip itself relates expressly or clearly how the informant knows of the criminal activity." State v. Sullivan, 169 N.J. 204, 213 (2001) (quoting Smith, 155 N.J. at 94). "In the absence of such explicit disclosure, 'the nature and details revealed in the tip may imply that the informant's knowledge of the alleged criminal activity is derived from a trustworthy source.'" Ibid. (quoting Smith, 155 N.J. at 94).

"[I]ndependent corroboration is necessary to ratify the informant's veracity and validate the truthfulness of the tip." Smith, 155 N.J. at 95. Where a tip "has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Golotta, 178 N.J. at 213-14 (quoting Rodriguez, 172 N.J. at 127-28). Additionally, "without the corroboration of suspicious detail there can be no inference that defendant was engaged in criminal activity." Zutic, 155 N.J. at 112.

Applying these principles, we are satisfied the State failed to meet its burden of proof. We agree with defendant the totality of the circumstances did not support a finding of "a reasonable and articulable suspicion of criminal activity," as the CI's unverified tip was entitled to limited weight and nothing

16

about the remaining circumstances, independently or cumulatively, corroborated criminal activity.  Ibid.

At bottom, the credible evidence in the record fails to establish the informant's basis of knowledge or "some other indicia of reliability," as required under Zutic.  155 N.J. at 110-11.  Indeed, the tip did not state how the CI became aware of the alleged shooting and lacked sufficient details to imply the CI "had knowledge of concealed criminal activity."  Rosario, 229 N.J. at 276.

For example, the CI in State v. Birkenmeier, 185 N.J. 552 (2006), provided detailed information about defendant and the alleged criminal activity, including his name; address; physical description; the make, model, and license plate number of his car; the time defendant would leave his home to make a marijuana delivery; and how he would transport the marijuana.  Id. at 561.  Even with such specificity, however, this tip only gave rise to reasonable and articulable suspicion once corroborated by law enforcement.  Ibid.

In contrast to the details provided in Birkenmeier, the tip here is far less specific.  Based on Det. Jackson's testimony at the suppression hearing, all that was relayed to police was that a man called "Nunu" may be involved in a retaliatory shooting, and that he "was going to McGuire Gardens or . . . the 'McGuire boys' were coming to Parkside to 'shoot it up.'"  The CI did not provide

a description of "Nunu's" appearance, his clothing, his address, the car he would be in, or any details about the time or specific location of the shooting. The record also does not indicate specifically when police received the tip, when the events giving rise to a motive to retaliate occurred, or how much time passed between receiving the tip and the motor vehicle stop. Such lack of specificity was insufficient to imply a basis of knowledge. Sullivan, 169 N.J. at 213.

Further, Det. Jackson never explained why he did not inquire further to obtain additional detail from the CI regarding "Nunu," the underlying events giving rise to the "retaliatory shooting," or the shooting itself, including when it was going to occur. Additionally, nothing in the tip mentioned, identified, or provided any details at all about "Nunu's" "associates." Rather, the CI provided generalized information that could be characterized as mere "casual rumor[s] circulating in the underworld," Smith, 155 N.J. at 94, particularly in an area Det. Jackson testified was "known for a multitude of crimes, violent crimes, [and] CDS-related crimes." Because the CI failed to provide predictive or "hard to know" information about "Nunu's" behavior, the State did not meet its burden in establishing the CI's basis of knowledge. "Without knowing the facts that led the informant to believe defendant was engaged in illegal activity, we cannot

18

make an independent determination of whether that conclusion was reasonable." Id. at 98.

Although Det. Jackson's March 2022 supplemental report stated the CI specifically identified Brown as "Nunu," Det. Jackson testified at the suppression hearing, consistent with Analyst Bogas' report, the tip provided the alias "Nunu," and police used public and law enforcement sources to determine "Nunu's" true identity was Brown. Likewise, the March 2022 report indicated "Nunu" and an individual called "Sav" were "shooting at each other," but Det. Jackson never mentioned "Sav" at the suppression hearing, nor did the court make specific factual findings as to the reliability of the CI's identification of "Sav." Further, Det. Jackson never confirmed the accuracy of "Sav's" identity or his criminality, despite being able to do so with respect to "Nunu" and his "associates."

In any event, we are convinced those circumstances do not alter our analysis or conclusion reached. Indeed, the State failed to establish "the tip itself relate[d] expressly or clearly how" the CI knew Brown's or "Sav's" identities or their relationship, Sullivan, 169 N.J. at 213 (quoting Smith, 155 N.J. at 94), or that "'the nature and details revealed in the tip . . . impl[ied] that the informant's

knowledge . . . is derived from a trustworthy source,'" ibid. (quoting Smith, 155 N.J. at 94).

Even under the less demanding reasonable suspicion standard, Det. Jackson's and Analyst Bogas' observations were insufficient to "validate the truthfulness of the tip," Smith, 155 N.J. at 95, or justify the stop. Despite the court's finding the tip contained "the name of the suspect, the means and nature of the crime, the location of the crime, and the motive for the crime," unlike the specific criminal activity police observed in Birkenmeier, here, any corroboration of the CI's tip was of "purely non-suspicious detail." Zutic, 155 N.J. at 112. Indeed, all police confirmed was "Nunu's" identity, his known "associates," and that they were in a vehicle together, none of which indicated criminality or "Nunu's" involvement in a retaliatory shooting.

Further, prior to the stop, police simply observed Brown in a car with four other men in the neighborhood where he lived. The CI stated nothing about a car or the involvement of anyone other than "Nunu." Although police identified defendant and the car's other occupants as "Nunu's" "associates," nothing in the record explained what that term meant, or how those "associates" were in any way involved in the purported retaliatory shooting. In fact, what the police did observe was contrary to the CI's information as reflected in Det. Jackson's March

20

2022 report. Indeed, rather than heading toward McGuire Gardens to "shoot it up," the red Hyundai was driving in the opposite direction.

Similarly, the evidence regarding the Instagram Live video failed to confirm anything about a shooting or "Nunu's" potential involvement. Pierson's vague statement "if they try to stop us, we're not going to stop" does not necessarily indicate criminal activity and, in any event, does not validate anything in the CI's tip to establish reasonable suspicion of criminal activity. The video did not reveal any weapons in the vehicle, nor did it suggest the occupants were involved in a retaliatory shooting, or other criminal activity. Pierson was not identified by the CI nor does the record show he, or anyone else in the car aside from "Nunu," was otherwise suspected in the "retaliatory" shooting, knew the "McGuire boys," or had any motive to retaliate. Not only could the statement have various innocent explanations, but in fact, the red Hyundai stopped when signaled and made no attempts to evade police.

Moreover, the record fails to demonstrate the police corroborated any events giving rise to a retaliatory motive. Det. Jackson failed to obtain from the CI any details about any shooting that would cause "Nunu" or defendant to retaliate. The record contains no confirmation that the shooting allegedly motivating "Nunu" to retaliate ever happened. Even considering the reference

21

in Det. Jackson's March 2022 report to "recent violence, and shootings" in the high-crime area of Parkside, there is no explanation, if, or how these shootings were related to "Nunu" or the purported Parkside-McGuire Gardens feud.

Det. Jackson's observation of the car and men shown in the Instagram Live video in a high crime area in the Parkside neighborhood was similarly insufficient to establish reasonable suspicion. Our Supreme Court "has held that '[j]ust because a location to which police officers are dispatched is a high-crime area does not mean that the residents in that area have lesser constitutional protection from random stops.'" Goldsmith, 251 N.J. at 399 (quoting Chisum, 236 N.J. at 549). Although "officers need not ignore the relevant characteristics of a neighborhood, . . . more is required to find reasonable suspicion." Id. at 400-401 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).

We acknowledge the court found credible Det. Jackson's testimony, including that the CI had provided information leading to five to ten arrests in the past. Even accepting Det. Jackson's representation in his March 2022 report that those arrests involved firearms, we are unconvinced this limited information about CCPD's prior success with this CI is sufficient to overcome the lack of detail or corroboration of the tip warranting the stop of the vehicle under the totality of the circumstances.

In light of the failure of the State to establish the basis of knowledge of the CI's tip and Det. Jackson's observations of solely commonplace behaviors, we are satisfied the credible evidence in the record demonstrates the stop was not "'justified at its inception' by a reasonable and articulable suspicion of criminal activity." Rosario, 229 N.J. at 276. Accordingly, the physical evidence seized from the stop and the subsequent frisk of defendant must be suppressed. Id. at 277 (citing State v. Herrerra, 211 N.J. 308, 330 (2012) ("The exclusionary rule generally bars the State from introducing evidence of the 'fruits' of an illegal search or seizure.")).

As noted, because we find no proper justification for the investigatory stop, we do not reach the remaining points on appeal. We reverse the court's denial of defendant's motion to suppress evidence. We vacate defendant's guilty plea and conviction and remand this matter for further proceedings consistent with this opinion. Because we are concerned that the judge would have a commitment to his previous view of the evidence, in fairness to the judge and the parties, we direct that the proceedings on remand occur before a different judge.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0450-22